The State v. Dunn.

administrators. *Miller v. Woodward*, 8 Mo. 169; *Allison v. Sutherlin*, 50 Mo. 274.

The judgment below is affirmed. All concur.

· THE STATE v. DUNN, *Appellant.*

| 80 | 681 |
|---|---|
| 115 | 464 |
| 80 | 681 |
| 119 | 417 |
| 80 | 681 |
| 61a | 626 |
| 80 | 681 |
| 158 | 584 |

| 80 | 681 |
|---|---|
| 171 | ²591 |
| 172 | ⁴343 |
| 175 | ⁴231 |

1. **Practice Criminal**: DISCHARGE OF JURY: JUDICIAL DISCRETION. Where a trial court has a discretion in a matter of practice, its exercise of the same is presumed to be sound and correct until the contrary is plainly and manifestly made to appear, and on the facts presented in the present case, it fails to appear that the trial court abused its discretion in discharging the juries on two trials of defendant for murder, because they could not agree on a verdict.

2. **Statute**: MANSLAUGHTER: INTENTIONAL KILLING. Where the killing is intentional, there can be no manslaughter in the third degree under Revised Statutes, section 1244, nor in the fourth degree under Revised Statutes, section 1249.

3. **Manslaughter in Fourth Degree**: STATUTE. Where the evidence shows that the defendant was the aggressor, and provoked the difficulty which resulted in the homicide, and intentionally killed the deceased, there can be no manslaughter at common law, and consequently none in the fourth degree under Revised Statutes, section 1250.

4. **Practice Criminal**: HARMLESS INSTRUCTIONS. A defendant cannot complain of the giving of an instruction as to a grade of manslaughter, of which he was not convicted, even though the instruction was erroneous.

5. **Verdict**: IMPEACHMENT OF. A verdict of a jury cannot be impeached, either by the affidavit of a juror, or by statements of the latter to third persons.

*Appeal from Saline Criminal Court.*—HON. J. E. RYLAND, Judge.

AFFIRMED.

*Boyd & Sebree* for appellant.

The discretion given the trial court by section 23 of

article 2 of the constitution, to discharge a jury in a criminal cause "if the jury    *    *    fail to render a verdict," is a legal discretion, and must amount to a legal necessity, and the record should show that the circumstances under which the jury is discharged, are such as from which it appears impossible that a verdict can be had in a reasonable time, and without forcing a conclusion by hardship to the jury.    The fact that the jury, after being out " one day," (as in this case,) and then reporting that they are " unable to agree," is not sufficient, unless the court itself is satisfied they cannot agree, and the record should show affirmatively that the court was so satisfied.    Wharton Crim. Plead. and Prac., §§ 500, 504, 508; Bishop Crim. Law, (6 Ed.) vol. 1, §§ 1034, 1035, 1036, 1033, and note to § 1034; Cooley Const. Lim., p. 325, § 327; *U. S. v. Harkell*, 4 Wash. C. C. R. 409; *U. S. v. Perez*, 9 Wheat. 579; *Comm. v. Cook*, 6 Searg. & R. 577; *Comm. v. Purchase*, 2 Peck. 521; *Ex parte Mc-Laughlin*, 41 Cal. 212; *People v. Cage*, 48 Cal. 323; *O'Brian v. Comm.*, 9 Bush. 383; *Teat v. State*, 53 Miss. 439; *Finch v. State*, 53 Miss. 363; *State v. Hays*, 79 Mo. 600.    The defendant was placed in jeopardy when the jury was sworn to try the cause at September term, 1882, the indictment being valid, and he having been duly arraigned, and plea of " not guilty " having been entered, and even if the discharge of the jury at September term was in the exercise of " legal discretion," the subsequent dismissal of the cause by the State's attorney at March term, 1883, operated as an acquittal.    *State v. Hays*, 79 Mo. 600; *Lee v. State*, 26 Ark. 260; *Bell v. State*, 44 Ala. 393; *State v. Callendine*, 8 Iowa 288; Bishop Crim. Law, § 1013.    The discretion given the court by the constitution extends to the discharge of the jury only.    The additional words "and commit or bail the prisoner for trial at the next term of court, or if the state of business will permit, at same term," give no discretion as to the subsequent proceedings of the court, but is both directory and mandatory, and at the same time a limitation on the power of the court.    It cannot give a discretion as

to committing or bailing the prisoner, because the constitution itself provides when a prisoner shall be bailed, and when he shall not be bailed. § 24, art. 2, Const. Mo.

The defendant had the constitutional right to trial at the September term, 1883, of the trial court, and the court having arbitrarily deprived him of that right, he should be discharged. Const., art. 2, § 22; Cooley's Const. Lim. 311; *Ex parte Stanley*, 4 Nev. It was the duty of the trial court in this case, to have given instructions as to manslaughter in the third and fourth degrees. The evidence shows that deceased made the first assault, and struck the first blow, and that the killing was by "a dangerous weapon," and the court did instruct as to manslaughter in the second degree. See *State v. Branstetter*, 65 Mo. 152; *State v. Edwards*, 70 Mo. 480. The fourth, fifth, seventh and eighth instructions for the State, should not have been given, and the thirteenth asked by defendant should have been given. The affidavit of Edward F. Nichols was sufficient and competent to show misconduct of the jury, and should have been received for that purpose by the court. *State v. Branstetter*, 65 Mo. 148.

*D. H. McIntyre*, Attorney General, for the State.

The special plea in bar constituted no defense to a further prosecution. Cooley's Const. Lim., (3 Ed.) top p. 327; Const. 1875, art. 2, § 23; *State v. Sims*, 71 Mo. 538; R. S., § 1657. The instructions given for the State were proper. *State v. Ellis*, 74 Mo. 207, 220; *State v. Talbott*, 73 Mo. 357; *State v. Curtis*, 70 Mo. 594. Upon an appeal from a conviction of murder in the second degree, the court will not examine alleged errors in instructions for murder in the first degree. *State v. Underwood*, 57 Mo. 40; *State v. Fritterer*, 65 Mo. 442. There was no error in refusing the defendant's instructions numbered six, seven, twelve, thirteen and fourteen. There was no evidence authorizing the giving of an instruction on manslaughter in the third and fourth degrees. A verdict of the jury cannot be impeached

by the affidavit of a juror; nor can this be done by the declarations of jurors to third persons. 75 Mo. 570; *State v. Dieckman*, 11 Mo. App. 538; *Coker v. Hays*, 16 Fla. 368; *Drummond v. Leslie*, 5 Blackf. (Ind.) 453; *Clum v. Smith*, 5 Hill 560; *State v. Fox*, 79 Mo. 109.

RAY, J.—The defendant was indicted at the November term, 1882, of the criminal court of Saline county, for the killing of Frank Edwards, on the 29th of August, 1882, in said county. The indictment was for murder in the second degree.

At the same term, as shown by the record, the defendant being duly arraigned, pleaded not guilty, and a jury being empanelled, the trial began on the 27th of that month, and, after hearing the evidence, the instructions of the court, and the argument of counsel, the jury on the 28th retired to consider of their verdict, and on the 29th returned into court, and being unable to agree, they were discharged by the court, and it was thereupon ordered by the court, that the bail of defendant be fixed at $2,000; whereupon court adjourned, until court in course.

So far as the record shows this action of the court, in discharging the jury and adjourning the court, was without objection on the part of defendant or his counsel; nor does it appear, that defendant demanded or asked another trial at that term. At the March term, 1883, the defendant was re-indicted for the same killing; this indictment charging murder in the first degree; whereupon, by order of the court, the first indictment was quashed, at the instance of the State's attorney. Thereupon, also, the defendant being arraigned on the new indictment, filed his motion to quash the same, which, was overruled by the court and excepted to by the defendant; the record, however, nowhere sets out this motion, or shows what it contained.

The defendant then filed special plea of former acquittal, on the ground of the discharge of the jury, and the continuance of the cause at the September term, 1882, and the quash-

ing of the first indictment, at the March term, 1883, which plea was by the court overruled and excepted to by defendant; whereupon, to-wit, on the 22d of March, 1883, the defendant being arraigned on the new indictment, pleaded not guilty, and a jury being empanelled, the trial was commenced; and on the 24th, the evidence being in, the instructions of the court given, and the argument of counsel being concluded, the jury retired to consider of their verdict; and on the 27th, the jury being called, reported to the court that they were unable to agree upon a verdict; whereupon they were discharged by the court, to which order discharging said jury, the defendant objected; whereupon court adjourned until court in course. The record of this term of court, however, fails to show any bill of exceptions preserving any of the objections, or exceptions of the defendant to the various rulings of the court, at said term; nor was there any such bill, at the September term, 1882, as to the order and rulings of the court, at said prior term. At the September term, 1883, however, of said court, as shown by a formal bill of exceptions, duly filed, at said term, the defendant withdrew his plea of not guilty, in said cause, and thereupon filed a formal special plea in bar of "former acquittal," setting up in detail, his said arraignment and plea of not guilty to said first indictment, the empanelling of said jury, the commencement of said trial, the discharge of said jury upon their being unable to agree upon a verdict, and continuance of the cause, as shown by the record of said September term, 1882; and, also, his said re-indictment for same offense at the March term of said court, for the year 1883; the quashing of said first indictment; his arraignment and plea to said second indictment, the empanelling of said second jury; the commencement of said second trial, and the discharge of said jury because of their inability to agree upon a verdict, and continuance of the cause as shown by the record of that term; by reason whereof, defendant says that under the constitution and laws of the State, he has been legally acquitted of the offense

charged in said indictment, and that having thus once or twice been put in jeopardy by reason of the premises, he is now entitled to be discharged from all further prosecution therefor. In support of this special plea, the defendant offered in evidence the records of said court, whereupon, the court upon due consideration, overruled said plea; to which action of the court in overruling said plea, the defendant, in due time and manner, excepted and preserved the same by bill in due form. And the defendant failing, and refusing to plead further, the court thereupon entered for him the plea of not guilty.

A trial was thereupon had before a jury, resulting in a verdict of guilty of murder in the second degree, and assessing his punishment at ten years' imprisonment in the penitentiary, and judgment accordingly, from which the defendant, after an unsuccessful motion for new trial and in arrest, has appealed to this court.

A number of instructions were given and refused at the final trial, and duly excepted to, which, together with the evidence in the cause, as well as the motions for new trial and in arrest, as far as deemed material, will be noticed in the progress of this opinion.

The principal ground relied on for a reversal, and especially urged upon our attention, is the action of the court in overruling defendant's special plea in bar of former acquittal, above set out. The constitutional provision on the subject matter of defendant's plea, is found in the 23rd section of the bill of rights, in our constitution, which declares: "That no person shall be compelled to testify against himself, in a criminal cause, nor shall any person, after being once acquitted by a jury, be again for the same offence, put in jeopardy of life or liberty, but if the jury to which the question of his guilt or innocence is submitted, fail to render a verdict, the court before which the trial is had, may in its discretion discharge the jury, and commit or bail the prisoner for trial at the next term of court, or if the state of business will permit, at the same term; and if

judgment be arrested after a verdict of guilty, on a defective indictment, or if a judgment on a verdict of guilty be reversed for error in law, nothing herein contained shall prevent a new trial of the prisoner on a proper indictment, or according to correct principles of law."

Tried by this rule, which is paramount to the rules found elsewhere, the plea in question, would seem to be manifestly bad, since it is not pretended that there has been an acquittal by jury; but it is insisted, by defendant's counsel, that the discretion, here given the court, to discharge the jury when they fail to render a verdict, is a "sound legal discretion," and that whenever it appears that that discretion has been arbitrarily or unsoundly exercised, such discharge, in legal contemplation, operates as an acquittal, within the meaning of the constitution, and entitles the defendant to his discharge. Concede, for the sake of argument, that this position is well taken, the question still remains, whether the record, in this case, shows that the court, in discharging said juries, or either of them, exercised its discretion, either arbitrarily or unsoundly. In such cases the rule is, that when the trial court has a discretion in matters of practice, its exercise is presumed to be sound and correct, unless the contrary is plainly and manifestly made to appear. In this case, nothing of the sort is shown. At the first trial, it is true that the jury were out but one day considering of their verdict, when, in the language of the record, they returned into court, and "being unable to agree," they were discharged by the court, and the cause continued. Here seems to be a judicial finding of record of the jury's being unable to agree; and without more, we cannot say, as a matter of law, that such finding is not true, or that the trial court that heard the evidence, saw the witnesses and knew the jurors in question, exercised an unsound discretion in so discharging the jury. This is more manifest, when we consider that, so far as the record shows, or, indeed, otherwise appears, said dis-

charge of the jury was without objection on the part of defendant.

At the second trial, the jury were out three days, considering of their verdict, when "being called, they reported to the court that they were unable to agree upon a verdict," whereupon they were discharged by the court.   It is true, that the defendant, at this term, did object to the order discharging the jury, but that objection could not have the effect to divest the court of its conceded discretion to judge and determine whether the  report of the jury, so made to the court, was true or not.   It may be conceded that the request of the prisoner, that the jury might be allowed, or even required to further consider of their verdict, ought not to be disregarded by the court in determining the question, yet, without more, it is in the sound discretion of the court to order their discharge, if in view of all the facts and circumstances, it is satisfied that the jury are unable to agree, after a reasonable time and opportunity has been afforded and they so report under oath.   In this case, the jury had been out three days, and we are not prepared to say that the prisoner's objection alone should outweigh all other circumstances of public justice, or control the honest discretion of the court in deciding, as it seems to have done, that the jury, in point of fact, were unable to agree upon a verdict, and if so, its power and duty to discharge the jury cannot be questioned, and such discharge of the jury, so ordered, constitutes no bar to another trial.   What might be the effect of an arbitrary, unwarranted discharge of a jury, need not now be considered or discussed, as no such case is before us.   *State v. Jeffors*, 64 Mo. 376, and authorities there cited.   *State v. Hays*, 79 Mo. 600, properly considered, is in strict harmony with the views here expressed, and affords no color for the plea here set up and overruled.   The trial court, therefore, committed no error in overruling said plea.

It is also objected that the court erred in failing to instruct the jury as to manslaughter in the third and fourth

degrées.   No instructions were asked on this subject; but under previous rulings of this court, it has been held that "it is the duty of the court, in the trial of a criminal case, to give proper instructions defining each crime, of which, under the indictment, the accused can be convicted, and of which there is evidence in the case."   *State v. Branstetter*, 65 Mo. 149.   In this case, was there evidence of manslaughter in either the third or fourth degree?   Under section 1244, Revision 1879, there can be no manslaughter in the third degree, when the killing was with the design to effect death.   In this case, it is manifest from the testimony, that the killing was intentional.   It could not, therefore, be manslaughter in the third degree, and consequently, no duty devolved upon the court to instruct as to that crime. For a similar reason, there could be no manslaughter in the fourth degree, as defined by section 1249, Revision 1879, as it cannot be pretended, under the evidence in the cause, that the killing was involuntary.   If one inflict a mortal wound, with a deadly weapon, upon a vital part, as in this case, he must be presumed to have designed the natural consequences of his act.   *State v. McDonnell*, 32 Vt. 492.

If, therefore, there is in this case manslaughter in the fourth degree, it must be by reason of section 1250 of the Revision of 1879, which declares that:  " Every other killing of a human being, by the act, procurement or culpable negligence of another, which would be manslaughter at common law, and which is not excusable or justifiable, or is not declared in this chapter to be manslaughter in some other degree, shall be deemed manslaughter in the fourth degree."   See *State v. Edwards*, 70 Mo. 480.

At common law, it is true, it was held that "in some circumstances when one intends to take life, and does it, his offense is manslaughter and not murder."   Thus, in the language of Redfield, C. J., sitting in the Vermont court, "if the jury should regard this as a *bona fide* case of mutual combat, without previous malice on the part of the accused, and that mutual blows were given before the ac-

**44—80**

cused drew his knife, and that he drew it in the heat and
fury of the fight, and dealt a mortal wound, although with
the purpose of doing just what he did do, that is, of tak-
ing life, or, what would be that intent, if he had been in
such a state, as properly to comprehend the nature of his
act, still it is but manslaughter." 2 Bishop on Crim. Law,
§ 676; *State v. McDonnell*, 32 Vt. 491. To the like effect
is *Dennison v. State*, 13 Ind. 510.

Can it be said that the case at bar falls within the com-
mon law rule of manslaughter above laid down, so as to have
made it incumbent on the court to have given an instruc-
tion on manslaughter in the fourth degree? Does the
evidence show this to have been a *bona fide* case of mutual
combat, without previous malice on the part of the accused;
or does it show, or tend to show, that mutual blows were
given before the accused drew his knife, or that he drew it
for the first time, in the heat and fury of the fight, and
dealt the mortal blow in question? A careful examination
of the record before us, shows very plainly, we think, that
the defendant's case does not come within the common law
rule of manslaughter above stated, either as to the question
of previous malice, or as to the time at which defendant
drew his knife. In the combat that ensued, the evidence
is abundant that the defendant was the aggressor, and pro-
voked and brought on the conflict. Some months before the
night of the homicide, as shown by the record, the deceased
and defendant had a misunderstanding and disagreement
as to the amount of wood hauled by deceased for defendant.
After that, deceased sued defendant on this account and got
judgment for the sum claimed by him. Afterwards, in a
conversation with Montgomery, who had rented some land
of defendant, on which he raised a crop of wheat, Mont.
gomery told defendant that Edwards, the deceased, had
promised to help him thrash the wheat. Dunn said he did
not want him, Montgomery, to hire Edwards to help thrash
the wheat, as he and Edwards might have trouble. Dunn
also said that if Edwards knew he had an interest in the

wheat, he might run a garnishment on it, and if he did, he would kill him.

The difficulty and homicide in question, occurred about 11 or 12 o'clock, on the night of the 29th of August, 1882, in the town of Slater, Saline county, Mo. During the earlier part of the night, the defendant and deceased, with Nichols, Snider and others, had been in Hannehan's saloon, where some of the party were playing ball pool. About 11 o'clock the saloon closed up, and the various parties left for home. It seems that the deceased accompanied Nichols home, and, that when they arrived there, they opened the gate, passed through the front yard, up to the front door of the dwelling, where they were standing and talking, when defendant and Snider, on their way from the saloon to the defendant's residence, passed by; and when opposite the front gate of Durnell, who lived on the adjoining lot west of Nichols, defendant checked his companion, Snider, and stopped; and then called to the deceased by name two or three times, to come out there, that he wanted to see him, or settle with him. It also appears that on the way from the saloon, and before they reached Nichols' house, the defendant mentioned to Snider, his disagreement with deceased about the wood account, and said it was unjust. When the defendant called to the deceased to come out, he answered and came out on the sidewalk near where defendant was standing, close to Durnell's gate, and leaned against the fence. Some conversation passed between defendant and deceased about settling the wood account. Defendant proposed to pay $3 and settle the same; but deceased claimed $6, and refused to settle on defendant's terms. Further conversation ensued, and the parties soon became angry, and indulged in abusive epithets, calling each other liars and other hard names. This wrangling lasted for some considerable time, and became so noisy as to attract other parties in the vicinity. While the quarreling was going on, defendant was seen to have his knife open in his hands. He afterwards shut it, but as he

advanced toward the deceased, he was seen to put his hands together before him, as though he was opening his knife. As the quarreling continued he approached the deceased, as one of the witnesses expressed it, "by intervals." He came up a little and stopped and quarreled again, and when he got up pretty close, he then, as the witness expressed it, " rushed upon " the deceased, and the fighting commenced. Some of the witnesses say, as they thus came together, that the deceased struck the first blow. But there can be no question, but what the defendant was the aggressor and brought on the conflict. Some blows were exchanged on the sidewalk when the fight commenced, when the parties clinched, fell and rolled off the sidewalk into the gutter, or street. Edwards was on top and Dunn beneath, and, during the scuffle, Edwards beat and pounded the defendant with his fist until defendant hollowed enough, when the deceased got off, or was pushed off, and staggered across the sidewalk to the fence, near Durnell's gate, when he hung on the fence and died almost instantly. Upon examination of his body, it was found that he was cut in eleven different places. None of the wounds, however, except the one in the neck, were serious or dangerous. The one in the neck was necessarily fatal. This wound was large and deep, and by it " the jugular vein, both carotid arteries, the glosso-pharyngeal and the pneumogastric nerve were all severed." From the wound the blood spurted out freely on the ground and across the sidewalk, where the deceased hung on the fence. One of the witnesses says this spurting of blood took place, while the parties were striking each other, and before they fell. Another witness says that it was after the deceased arose from the combat. The latter was doubtless correct as to the time. With such a wound thus inflicted, the defendant, under all the rules of law and evidence, must be held to have intentionally killed the deceased; and, under such circumstances, it was not error in the court to fail to instruct as to manslaughter in the fourth degree. There was

much evidence of physicians and surgeons, as to the paralyzing effect of such a wound, tending to show that the victim, after its infliction, could neither talk, walk or repeat blows, and must necessarily die almost instantly. The evidence, however, shows that the deceased got up, at the conclusion of the fight on the ground, at the edge of the street, and walked or staggered across the sidewalk to the fence, where he hung dying. Next morning a small, four-bladed congress knife was found on the ground where the scuffle occurred, open and bloody, and identified as the knife of defendant. When the defendant got off of the deceased, he rose and held out his empty hands, saying that he did not want to hurt deceased, and calling on by-standers to see that he had nothing in his hands. There is no evidence showing, or tending to show, that defendant drew his knife after the combat commenced, or during the heat and fury of the fight. All the evidence in the case tending to show, that he drew the knife before any blows were struck, and that he went into the fight with his knife open. It is also insisted for defendant, that the court erred in giving the 3rd, 4th, 5th, 7th and 8th instructions for the State, and in refusing the 13th, asked by defendant. The 3rd instruction was in reference to manslaughter in the second degree, of which the defendant was not convicted, and of which, if erroneous, he cannot complain. The 4th and 5th are, in substance, such as has often been approved by this court, and furnish no cause for reversal. The 7th and 8th have reference to the plea of self-defense, and are in harmony with previous rulings of this court. The 7th instruction is substantially like the one on the same subject, given and approved in the case of the *State v. Starr*, 38 Mo. 274. To the same effect, also, are the following cases: *State v. Brown*, 64 Mo. 367; *State v. Christian*, 66 Mo. 138; *State v. Brown*, 63 Mo. 439; *State v. Underwood*, 57 Mo. 40.

The 13th instruction asked for defendant, had reference to the credibility of a witness. The jury, in other instructions had already been told that they were the sole judges

of the weight of the evidence, and the credibility of the witnesses, and it was unnecessary to repeat it. The last objection urged for defendant, has reference to the manner in which the jury were alleged to have reached their verdict, and the nature of the proof by which it was sought to establish the same. It has often been held that a juror was not competent to impeach his verdict. *State v. Branstetter*, 65 Mo. 149. In this case it was offered to show this fact, by affidavit of a third party, to the effect that the juror had so told him. What the juror cannot do directly, he cannot accomplish indirectly, by disclosing the same to a third party, and then render competent the information so obtained. This is not permissible.

The cause seems to have been fairly tried, under proper instructions, and finding no error in the record, the judgment of the criminal court is, therefore, affirmed. All concur, except Henry, J., who dissents.

HENRY, J., DISSENTING.—I think that the court should have given an instruction upon manslaughter in the 4th degree. In refusing it, the court assumed that defendant opened his knife before the combat commenced, and, that he was prompted by his malice towards deceased to seek a difficulty with him. Two questions, which it was the province of the jury to pass upon. The evidence shows that at one time, before the fight commenced, defendant had his knife open, but it is equally positive, that before the combat, he shut his knife; what he did with it, does not appear. He was not seen to open it afterwards. It was not afterward seen in his hands, and the only evidence to show that he opened the knife before the fight began, was, that "he was seen to put his hands together, as though he was opening his knife." If it was a material question whether the knife was again opened, before the parties engaged in the conflict, was it so clear and manifest, that it was opened before the fight, that the court could assume that fact? Was the evidence so clear and conclusive that

defendant called the deceased to him, not as he said, to have a settlement of their pecuniary difference, but in order to provoke a difficulty, and get an opportunity to kill him, or do him some great bodily harm, that the court could assume that, as a fact in the case?

With due deference to my associates, I think not, and, therefore, enter my dissent.