# THE STATE v. LANE, Appellant.

### Division Two, November 27, 1900.

1. **Evidence: ASSAULT: INSTRUMENT USED: HOW CONNECTED WITH CASE.** One witness testified that defendant struck the deceased on the head with his pistol and knocked him down. The physicians who made the postmortem examination testified that the injury to the brain was caused by some small pointed instrument driven into the side of the skull. *Held*, that it was competent to permit another witness to testify that the pistol which defendant ordinarily carried had a small catch, used in throwing the cylinder to get the cartridge out, which projected a quarter of an inch from the pistol, although he was not present and could not say that defendant struck deceased with this particular pistol. It was not the bringing of a remote and distinct transaction into the case.

State v. Lane.

2. **Maltreatment: INSTRUCTION.** Where the evidence is all to the effect that the wound inflicted by defendant's pistol on the head of deceased caused his death, and no effort has been made by defendant to show any maltreatment of the wound or any misconduct on the part of the deceased with reference thereto, it is proper for the court to instruct the jury that the postmortem discovery that an operation at the proper time would have saved the life of deceased, is no defense to the charge of murder.

3. **Manslaughter: INSTRUCTION: EVIDENCE.** The striking of a prisoner under arrest by a marshal with a dangerous weapon in a heat of passion without a design to effect his death, unless justifiable on the ground that it was necessary to accomplish his incarceration, is manslaughter in the third degree. And the striking of deceased with a pistol, instead of shooting him, indicated that defendant had no design of killing the prisoner.

4. ———: ———: **HEAT OF PASSION.** And a failure to define the words "heat of passion," as used in this instruction, was not error, since it was used in its ordinary, and not in its technical sense.

5. ———: **ARREST: UNNECESSARY FORCE.** The question of whether or not the death of a prisoner was due to the unnecessary and unreasonable exercise of force on the part of an officer in attempting to effect the prisoner's incarceration, is one of fact for the jury, under proper instructions. And where the jury have found, by their verdict, after having been properly instructed, that the blow that caused the prisoner's death was an unnecessary and unreasonable exercise of force, and the facts are sufficient to sustain that finding, the court will not interfere.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort,*
*Judge.*

AFFIRMED.

*Ralph Wammack, J. L. Downing* and *J. T McKay* for appellant.

(1) The testimony of the witness that defendant sometimes carried a large Colts' pistol, which had a small slide or catch on the side that stuck out from the weapon, had no con-

nection with the pistol with which the defendant actually struck the deceased, but was a remote and separate transaction altogether, and should not have been admitted. Evidence of independent and disconnected matters are not admissible. State v. Moberly, 121 Mo. 610; State v. Noeninger, 108 Mo. 171; State v. Parker, 96 Mo. 368; State v. Fitzgerald, 130 Mo. 427; State v. Taylor, 126 Mo. 539; State v. Kennade, 121 Mo. 414. (2) Instruction 3 given on behalf of the State, denies to the defendant, even in mitigation of punishment, his legitimate defense that McGregor, by his wanton neglect and disregard for his own welfare, was the real cause of his own death. We might admit as an abstract proposition that the rule laid down in the case of State v. Landraf, 95 Mo. 103, is correct, but no rule can with safety be applied to every case, and we respectfully submit that this is a case in which the severity of such rule should, in justice to the accused, be relaxed. The wound inflicted, in its inception, was not a fatal one, nay, not even a dangerous one; the weapon used, in the manner it was used, was not a deadly weapon. The effect then of giving this instruction was to destroy the effect of the instructions given on behalf of the defendant on this line, and to deny defendant, even in mitigation of punishment, the showing made that McGregor's death was caused by his own reckless and wrongful act. (3) Instruction 4, given in behalf of the State, in relation to manslaughter of the third degree should not have been given. There is no evidence in the record that the blow was struck in a heat of passion; to the contrary, the evidence shows conclusively that defendant struck the blow as a protection against the assault of the deceased, and in order to effect his incarceration. State v. Strong, 55 S. W. Rep. 79; State v. Rapp, 142 Mo. 443. No definition of the words "in a heat of passion" was given in said instruction, or in any instruction. State v. Strong, 55

S. W. Rep. 79; State v. Andrew, 76 Mo. 101.   (4) There can be no doubt but that the jury was influenced in a great measure, in arriving at their verdict, by the clamor of the populace for blood, the unsettled and excited condition of the people of the county over the murder of the Tettaton family, and the commission of other cold and dastardly murders in their midst shortly before the trial.   State v. Young, 119 Mo. 526; State v. Primm, 98 Mo. 368.   (5) If it is permissible to throw all the personal animosity and hate the human heart can hold in the closing argument of counsel for the State, then this ground for a reversal should be ignored; but if the terms of "red-handed murderer," "dirty scoundrel," uttered in the most ferocious and blood-thirsty manner affords any ground for relief, then this case should be reversed on that ground alone.   State v. Pagels, 92 Mo. 300.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) Defendant insists that there is no evidence showing the blow to have been struck by him in a heat of passion.   In this he is mistaken.   The evidence shows an unquestioned heat of passion.   He had previously disarmed the deceased who was drunk; it was not necessary that he should strike him down in order to drag him into the jail.   He had asked assistance and the party called upon was at hand.   Instead of asking this party to aid him in putting the deceased in jail he contents himself with striking him across the head with his revolver.   The full tenor of the evidence goes to show the fact that the defendant was in a heat of passion.   It is not necessary that this be shown by express words.   In fact the better proof is made out by the peculiar circumstances of the case.   There is no evidence whatever showing the blow to

have been given in protection against the assault of the deceased. In the first place, there was no necessity for the blow to have been struck for any purpose whatever, nor is there any circumstance shown or attempted to be shown that it was necessary for defendant to strike the blow. While on the witness stand defendant himself does not so state, his only excuse, from his own lips, was that he didn't intend to do it. Then why did he strike the deceased? The only reasonable answer is, he was in a heat of passion at the time. The trial court is also charged with committing error for its failure to define the words "heat of passion." In this defendant is wrong. It was not incumbent on the trial court to define these words in an instruction, as they were not used in their technical sense, but were only used as a condition of the mind contradistinguished from a cool state of the blood. Technical words should be avoided and unless they be defined in an instruction they will be considered in the light of their usual meaning. It therefore was not necessary to define them. In the case at bar the heat of passion was occasioned at the time the fatal strike was given. It was not exercised under circumstances which invoked its technical meaning and therefore it did not become necessary to define it in the instruction. McLain's Criminal Law, sec. 337; State v. Berkley, 109 Mo. loc. cit. 673. (2) This court is asked to reverse the judgment of the trial court on the ground that the testimony is insufficient to convict and that the jury was prejudiced against the defendant. We submit from an examination of the testimony this court will not undertake to say that the defendant was unfairly treated in any particular, nor is there anything showing passion or prejudice on the part of the jury. In their brief defendant's attorneys charge the jury with being influenced by the clamor of the populace for blood, the unsettled and excited condition of the people of the county

over the murder of the Tettaton family and the commission of other cold and dastardly murders in their midst shortly before the trial. Even if this were true there is nothing in the record showing any such state of affairs. This court will confine itself absolutely to the showing made by the record. It can not in justice to the trial court go beyond the record and its contents. Besides, if the people of the county were prejudiced against the defendant, the law afforded him a right to change of venue, but as he did not see proper to ask for that we are entitled to the presumption that no such prejudice existed.

GANTT, P. J.—At the January adjourned term, 1896, of the circuit court of Dunklin county, the defendant Samuel Lane was indicted and charged with the murder of James McGregor, on November 20, 1895. On various grounds the cause was continued until the January term, 1898, at which term it was tried with the result of a hung jury.

At the October term, 1898, the cause was again tried, and resulted in a conviction of manslaughter in the third degree and his punishment fixed at three years in the State penitentiary, from which he has taken this appeal.

At the time of the commission of the act the defendant was night marshal of the town of Malden, Dunklin county, Missouri. On the 20th of November, 1895, the deceased became drunk and disorderly, and had upon his person a pistol. About half past eleven o'clock on the night of November 20, 1895, the deceased was in a saloon run by a man by the name of Paxton; the defendant in company with two or three other persons went into the saloon and intended to pass from there into a room occupied as a restaurant to get some oysters. When he got in the saloon he saw the deceased, who was behaving in a disorderly manner. He told him to consider him-

Vol. 158 mo.—37

self under arrest and asked him to give him the revolver
which he had on his person. Deceased refused to do so.
Defendant then took hold of deceased, threw him upon the
floor and took the revolver away from him. He then asked
a man by the name of A. E. Bohlck to assist him in putting
the deceased in the city jail. They took the deceased to the
door of the jail, but he refused to go in. ·

Bohlck details the occurrence at the prison door as fol-
lows: "Finally Lane handed me the lamp and started to get
hold of McGregor, but McGregor would not let him get hold
of him, and they scuffled around in the room some little, but
finally Lane pulled out his pistol and McGregor remarked to
him, 'Kill me if you want to,' and still refused and tried to
break loose, when Lane hit him with the pistol. He struck him
on the side of the head. When he struck him he knocked him
down, and we had to drag him in. Lane then closed the door
of the calaboose and went off and left him there. Lane did
not ask me to assist him in putting him in the calaboose, I
was there holding the lamp all the time. Lane is a much
larger and stronger man than deceased was, and deceased had
no weapon of any kind in his hands that was visible to me,
for just before that time Lane had disarmed him. McGregor
was drunk, pretty well intoxicated."

McGregor died about two weeks after he was struck. Dr.
Shivers testified that he had not attended McGregor imme-
diately before his death, but assisted in the post mortem ex-
amination. He testified as follows:

"We found on the left side of the head in front a wound
which had just about healed up—a very small opening in the
skull; it had united. After removing that we found a small
depression in his skull, it was hardly a quarter of an inch in
diameter, and then in removing the skull, we found the cov-
erings of the brain inflamed, the blood vessels enlarged; the

inner portion of the skull was a little larger, probably between an inch and a quarter wide and an inch long; it was broken off as though bearing down on the brain; the other end was still attached, only being loose at one end, producing an impression on the brain. When we cut the membranes of the brain we found an abscess. This wound or abscess had been caused by a blow, evidently of some pointed instrument, something struck him there and knocked the hole in his skull and produced the pressure on the brain, and there was an inflamation followed which resulted in suppuration and that caused death. I think he died on the 3rd day of December, 1895. The post mortem was on the 4th or 5th." On cross-examination this witness said that he never attended the deceased prior to his death. He saw him after he was hurt, that is, saw him come in the postoffice when he was up going around with a handkerchief around his head. It was about two weeks from the time he was hurt until he died. That particular point in the skull that was injured was on the left side over the frontal bone. The skull at that place was tolerably thick. The wound looked to have been probably an inch and a half long. It had all grown up except a small place and was hardly a quarter of an inch long at that time. I do not know how the deceased received the wound. It is possible that inflamation of the brain might have been caused from some other source, but it is evident it was caused by this pressure on the brain at the wounded place. It would have taken a right hard lick to break the skull at this place, had it not been for some sharp point used. With some small point striking the skull there it would not take a hard lick. If proper operation had been performed within a few days after the injury the life of the deceased could easily have been saved. The blow was not necessarily fatal but the injury inflicted by it caused the death of deceased.

Dr. A. S. Harrison, the coroner, testified substantially to the same effect as Dr. Shivers, and Dr. Nix for the defendant confirmed their testimony as to the nature of the wound and cause of death.

J. H. Bledsoe, witness for the State, testified as follows:

"I know the defendant Sam Lane and knew him in 1895. I was then city marshal of Malden. Mr. Lane was at that time night watchman. He carried a Colts' pistol. That is a medium sized pistol, probably 41. It had on the left side of the muzzle a small pointed catch used in throwing the cylinder to get the cartridge out; it projected probably a quarter of an inch from the pistol. I remember the night that McGregor was hurt. Mr. Lane came to my house. He came to my house after it happened and told me about it and I got up and went to the calaboose with him. He said he had had some trouble with McGregor that night and wanted me to go up to the calaboose to see him. He said he had put him in the calaboose and had to hit him, 'and I want you to go and see him.' I don't think he told me what he hit him with. When I got there I found McGregor sitting on the floor; he was bloody and there seemed to be a little cut place on the left side of the head; probably a quarter of an inch long, maybe longer; it had stopped bleeding at the time I saw it."

For the defendant the evidence corroborated that of the State to the effect that McGregor was drunk on the night he was struck, and had a pistol; that the defendant had to disarm him by force and having done so took him to the prison; that he was admonished that he would be arrested and replied that Lane, Bledsoe and the whole push couldn't arrest him; that the marshal was notified that deceased was on a drunk and armed.

Defendant in his own behalf testified:

"I have lived in Malden 12 years last July. About the

20th of November, 1895, I was night marshal, and it was part of my duty to make arrests of offenders who violated the law. I saw James McGregor there that night.   I was warned by Mr. Watkins to look out for him, as he had a pistol.   Dolly Bohlck and Wilcox, who lives now at Bloomfield, invited me in Jim Paxton's saloon to eat some oysters with them, and as I went through with them I saw Jim McGregor, and he struck me as soon as I went in to set them up to him.   We had always been good friends, and I told him he had enough. He showed me a pistol, and said there was some fellows there that had it in for him, and he didn't intend to take the worst of it.   I told him he would have to give the gun to me, as I could not let him go around drinking with a gun.   He would not give it up.   I called on Pumper Adkins to come around and help take the gun away from him.   McGregor started to run, but I caught him, threw my hands back of his chin, this way, and went after the gun.   He fell back, and I took the gun away from him.   I then called on Bohlck to help take him to the calaboose.   I wanted some one there when I searched him to see what money I got off of him, and what other things I found.   I found nothing but the pistol.   I took him to the calaboose, and put him in.   He resisted and fought me at the calaboose door.   He struck at me, and I knocked his lick off.   We scuffled around the room there three or four minutes.   I didn't intend to hurt or seriously injure him when I struck him on the side of the head.   I just slapped him with the pistol a little tap.   I didn't aim to hurt, and had no idea of hurting him. ·  I saw him afterwards, had a talk with him.   He said he didn't blame me for what I had done.   We were good friends afterwards."

Various errors have been assigned to reverse the judgment and they will be noticed in the order of defendant's brief.

I.　It is insisted the court committed error in permitting the witness Bledsoe to testify to the character of the pistol that the defendant usually carried.　Bohlck had testified that defendant had drawn his revolver at the prison and struck the deceased with it.　In fact, had knocked him down.　The physicians who made the postmortem examination all agreed the wound had been made by a small pointed instrument.　Bledsoe testified that the pistol which defendant ordinarily carried had a small catch, used in throwing the cylinder to get the cartridge out, which projected probably a quarter of an inch from the pistol.　Because Bledsoe was not present and could not say that defendant struck deceased with this particular pistol, it is claimed this evidence was the introduction of a remote and distinct transaction into the case.　We think the evidence was competent, taken in connection with the other evidence in the case.　It tended very clearly to explain how the peculiar wound was made.　It was such a fracture as the ordinary smooth surface of a pistol would not make, and the jury could draw the inference very properly from this evidence that defendant struck deceased with this weapon, which he usually carried and which had a projection well suited to inflict this particular fracture of the skull.

II.　Instruction numbered 3, given in behalf of the State is challenged on the ground that it denies defendant his defense that McGregor was the cause of his own death by his wanton neglect and disregard of his wound.　That instruction is in these words:

"3.　If the jury believe and find from the evidence that the death of James McGregor resulted from the effects of a blow upon the head inflicted by defendant with a pistol in Dunklin county, Missouri, in November, 1895, said death occurring in said county and State in December, 1895, you can not, in arriving at your verdict, take into consideration the

fact, if fact it be, that said James McGregor's life might have been saved, after the infliction of said blow, by a proper medical or surgical treatment."

No effort had been made to show any maltreatment of the wound, or any misconduct on the part of deceased with reference to his wound, and the evidence of all the physicians was to the effect that the wound caused the death of McGregor.    The court was right in telling the jury in plain language that the postmortem discovery that trephining at the proper time would have saved the life of the deceased, was no defense whatever to the charge.    [State v. Landgraf, 95 Mo. 97; State v. Strong, 153 Mo. 548; 9 Am. and Eng. Ency. of Law (1 Ed.), 534, et seq.; Com. v. Hackett, 2 Allen, 136; 1 Hale P. C. 428.]

III.    Among other instructions the court gave the following.

"4.    The court further instructs the jury that if they find and believe from the evidence that at Dunklin county, Missouri, on November 20, 1895, within three years prior to the filing of this indictment, defendant Samuel Lane intentionally and feloniously struck the deceased, James McGregor, on the head with a pistol, which said defendant then and there held in his hand, and that said McGregor died, on December 3, 1895, and prior to the finding of this indictment, from the effect of such blow, and that such blow was struck by said defendant in a heat of passion without a design to effect the death of said James McGregor, and that said pistol so used was then and there a dangerous weapon, you will find the defendant guilty of manslaughter in the third degree, unless you find that such killing, if done by defendant, was under such circumstances as to be justifiable under the law as given by the court.    If you find the defendant guilty of manslaughter in the third degree as above defined, you will assess

his punishment at imprisonment in the penitentiary not exceeding three years, or imprisonment in the county jail not less than six months, or by a fine not less than five hundred dollars, or both a fine not less than one hundred dollars and imprisonment in the county jail not less than three months."

That the instruction correctly defines manslaughter in the third degree can not be doubted.    Moreover we think the evidence fully sustains the court.

This court has repeatedly ruled that where the killing is intentional or wilful, there can be no manslaughter in the third degree.    [State v. Edwards, 70 Mo. 480; State v. Curtis, 70 Mo. 600; State v. Dunn, 80 Mo. 689; State v. Watson, 95 Mo. 411.]

But the court was clearly justified in this case in submitting to the jury whether the defendant intended to kill deceased when he struck him.

The evidence clearly established that defendant in a sudden passion killed deceased with a dangerous weapon by a blow without a design to effect his death.    The very manner of using his revolver, to-wit, by striking deceased instead of shooting him, indicated that he had no design of killing him. The instruction does not conflict with the second instruction given for defendant or the fifth given for the State.

As to failure to define heat of passion, it is sufficient to say as was said in State v. Andrew, 76 Mo. 105, that the phrase as used in this connection, was evidently used in its ordinary sense and not in its technical sense.    It was most favorable for the defendant and he could not possibly have been injured by a failure to define the technical meaning of heat of passion as contradistinguished from a cool state of the blood.

IV.    The remaining criticism of the instructions is so general and indefinite that we are at a loss to discover at what it is aimed.    The instructions are such as have often been

approved by this court, and those refused were either already given or were inherently erroneous and no error was committed in refusing them.

V.  As to the charge that the jury were allowed to separate, we do not well see how the circuit court could have found differently.  Eleven of the jury and all the officers in charge testified positively that there was no separation, and that one juror who sought to impeach his own verdict stood alone and wholly uncorroborated.

VI.  There is no evidence in the record that the prosecuting attorney was guilty of the highly unprofessional conduct charged against him.  The burden was on the defendant to establish this ground in his motion for new trial and having failed to do so, it must be presumed that he was at least mistaken as to the fact when he filed his motion.

VII.  The remaining assignment is that the verdict is the result of passion and prejudice.  Certainly there is no evidence that he was rushed into his trial without an opportunity to prepare his defense.  The homicide occurred in December, 1895, and he was not convicted until October, 1899.  No application was made for a change of venue on account of the prejudice of the inhabitants.  One jury failed to agree.

The evidence does show that he was generally considered an efficient officer, anxious and willing to do his duty and as such should be commended.

The common law is thus stated by East: "Where persons having authority to arrest or imprison or otherwise to advance or execute the public justice of the kingdom and *using the proper means for that purpose* are resisted in so doing, and the party resisting is killed in the struggle, such homicide is justifiable."  In State v. Fuller, 96 Mo. 165, this court said: "An officer in making an arrest should use no unnecessary vio-

lence; but it being his duty to make an arrest, the law clothes him with the power to accomplish that result. His duty is to overcome all resistance and bring the party to be arrested under physical restraint, and the means he may use must be co-extensive with the duty, and so the law is written. 1 Bish. Crim. Pro. (2 Ed.), sec. 160." In State v. Dierberger, 96 Mo. 666, loc. cit. 676, it was further said: "Now, in this case, the defendant is guilty of no offense unless he resorted to extreme and unnecessary measures—unless he shot Horne when there was no reasonable necessity for so doing, in order to accomplish the arrest. Whether he did so is the very issue in this case." In State v. McNally, 87 Mo. loc. cit. 652, the right of an officer to kill when the offender resists is fully discussed and maintained, and all the authorities collated.

Such being the law of this State, the main issue in this case was whether there was a reasonable necessity for the defendant to resort to the means he did in compelling deceased to submit to his command to enter the prison after he reached it and in overcoming the resistance offered by the prisoner under all the circumstances. Recognizing fully our duty to uphold the right of a peace officer to use all necessary and reasonable force to effect an arrest when the right and duty to do so devolve upon him, it is no less our duty to enforce the law which forbids him to resort to extreme and unnecessary measures in so doing. This record presents a case where the question was one of fact whether the death of the prisoner was caused by an unnecessary blow by the officer in compelling obedience by the prisoner. The prisoner was drunk and had been disarmed. The officer was sober and a much more powerful man than the prisoner and had an assistant, one Bohlck, with him. The prisoner resisted by attempting to elude the officer when he attempted to take hold of him to push him into the cell. The officer says deceased struck at him and he

knocked his lick off with his hand.   Bohlck says:   "McGregor wouldn't let him get hold of him.   They scuffled around the room when Lane, the officer, pulled his revolver, and the prisoner said 'Kill me if you want to' and continued to try to break loose," whereupon the officer struck him with his pistol and knocked him down and the two then dragged him into the cell or room.

That the officer felt he had struck the prisoner a severe blow on the head, is fairly deducible from the fact that he went to the marshal's house about midnight and awoke him and requested him to go down and see the prisoner, saying he had struck him.   They went to the calaboose and found the prisoner sitting on the floor and he was bloody with the wound on the side of his head.   Considering the inequality in the size of the officer and the prisoner, that the officer was sober and the prisoner drunk; that the officer had an assistant; that he was already in a room adjoining the calaboose and had made no effort to escape when coming from the saloon to the prison; that the officer at no time requested Bohlck, his assistant, to aid him in putting the prisoner in the calaboose but resorted to his pistol and knocked him down, we do not think we can, as a matter of law, say that he did not use excessive and unnecessary means to compel obedience to his authority.

The court on this subject instructed the jury as follows:

"5.   The court instructs you that if you find from the testimony that at the 20th day of November, 1895, defendant was a peace officer in the city of Malden, Dunklin county, Missouri, it was his right and duty to arrest any one violating the law in his presence and to take him before the proper officer to be dealt with according to law, or to take him to the proper place of confinement to be restrained until he could be reasonably tried by the proper officer, and in doing this he was authorized to use such force as was necessary, and such force as reasonably appeared to him from the circumstances to be

State v. Lane.

necessary to overcome all resistance, even to the taking of life; and if the defendant struck the fatal blow which caused the death of said James McGregor, as described in previous instructions, and did so in order to accomplish the arrest or the necessary incarceration of said McGregor, and if you further find and believe from the testimony that said defendant in so doing did not use any greater force, and did not do more than was necessary, or did not use any greater force or efforts than reasonably appeared to him, from the surrounding circumstances, to be necessary to accomplish such purpose, you will acquit the defendant. But if you find and believe from the evidence that the blow was struck as stated above, by defendant, in accomplishing the arrest or necessary imprisonment of said James McGregor, and that such blow struck under such circumstances that the jury do not find from the evidence that it was either necessary, or that defendant did not reasonably believe, from the circumstance attending the blow, that it was so necessary, then the jury can not acquit upon the ground that defendant was a peace officer engaged in making an arrest or imprisonment following an arrest."

This instruction correctly defined the law governing the rights of the defendant.

The officer says he merely gave him a tap with the pistol from which it may justly be inferred that he himself did not consider a severe blow necessary.

By their verdict the jury have found that the blow was unnecessary and was an unreasonable exercise of force under the circumstances. As already said it was fairly a question of fact, submitted under favorable instructions for the defendant, and we are not justified in interfering with the verdict on this ground.

The judgment must be and is affirmed. *Sherwood* and *Burgess, JJ.,* concur.