## BENNIE HARRISON v. STATE.

No. A-3632—Opinion Filed Feb. 22, 1921.

(195 Pac. 511.)

(Syllabus.)

1. **HOMICIDE—Manslaughter in First Degree—Sufficiency of Evidence.** Evidence examined, and held sufficient to support a conviction of manslaughter in the first degree.

2. **HOMICIDE—Death from Septic Poisoning After Wound.** Where a wound inflicted by defendant resulted in septic poisoning, from which deceased died, defendant is responsible for the death.

3. **TRIAL—Instructions—Technical Incompleteness.** When the instructions considered as a whole are as favorable to defendant as the law and the evidence would warrant, a conviction will not be reversed because certain paragraphs of the instructions when considered separately are technically incomplete.

*Appeal from District Court, Wagoner County; Charles G. Watts, Judge.*

Bennie Harrison was convicted of the crime of manslaughter in the first degree, and he appeals. Affirmed.

Bennie Harrison was convicted in the district court of Wagoner county of the crime of manslaughter in the first degree, and sentenced to serve a term of five years' imprisonment in the state penitentiary, on an information filed in said court on the 31st day of March, 1919, charging him with the murder of one Luther Barnes.

The killing occurred on the 27th day of December, 1918, near the home of Manley Thompson, who was a brother-in-law of this defendant, and at whose home the deceased, Barnes, was also staying while working as a farm hand.

The circumstances surrounding the homicide are,

in substance, as follows: Manley Thompson, his brother, Sam Thompson, and defendant, Bennie Harrison, had arranged to go hunting on the day of the killing, and had left the home of Manley Thompson for the purpose of going to Tallahassee to meet some other parties from that town. They had started to walk through the country. After they had traveled a distance of about one-fourth of a mile from Thompson's place, deceased, Luther Barnes, overtook them, apparently for the purpose of joining them on the hunting expedition. Barnes was carrying an old flour sack for a hunting bag, and defendant, noticing this fact, remarked to Barnes that the sack belonged to him (defendant). A quarrel ensued over the ownership of the sack and as to who should have it, resulting in the firing by defendant of two shots from an automatic Remington shotgun, one of which shots struck Barnes in the leg and the other in the shoulder. Neither of these wounds were necessarily fatal, but septic poisoning set up, and Barnes, after lingering until the 13th or 14th of January following, died as a result of the poisoning occasioned by the infliction of the wounds. It appears that a wad from one of the loads and some shot and perhaps particles of clothing lodged in the wounds and contributed to some extent to the infection.

Defendant claims that the killing was committed in his necessary self-defense; that when he accused Barnes of having his hunting sack, Barnes replied that he knew it was defendant's sack, but said, "No damned son of a bitch would get it that day." Defendant further states that when this remark was made he was looking down, and immediately looked up and saw Barnes starting to his shoulder with his gun; that defendant had his

gun under his left arm, and turned as quickly as he could and shot Barnes in the leg; that the shot did not seem to have any effect on Barnes, and he was still coming at defendant with his gun "in a killing position," pointed at defendant, but that Barnes never got the gun to his shoulder; that Barnes was also carrying an automatic Remington shotgun.

Nobody but defendant and deceased were at the immediate scene of the difficulty, but Manley and Sam Thompson, who were some little distance (approximately 30 yards) ahead of Harrison and Barnes, testified in substance that deceased had a hunting sack, and Bennie said it was his, and Bennie asked him for it and deceased said, "I don't know whether it is yours or not," and said:

"If it is your sack, you are not going to get it today, I am going to keep it to-day, but you may get it to-morrow." "We were in front, and had walked fast and gained on them, and as we went across a field we came to a ravine, and we went across and up the hill, and they were in the center of the ravine, and I heard two shots, one right after the other, and looked around after the last shot and saw deceased falling to the ground, and defendant had his gun in his hand. We went back to where they were, and deceased's gun was lay-- ing on the ground about three feet from him. Deceased had fallen on his right side, and had blood on him."

There is also some evidence in the record that deceased and defendant had quarreled some few days before the homicide, and were not on very friendly terms with each other. There is also evidence that after deceased was wounded, and between the time of the shooting and his death, he sent for defendant, and de-

fendant went to him and assisted others in caring for him.

*E. L. Kirby,* for plaintiff in error.

*S. P. Freeling,* Atty Gen., and *W. C. Hall,* Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above). It is a deplorable thing that a human life should be taken for no other apparent reason than the possession of an old flour sack to be carried on a hunting trip. The evidence discloses that defendant left home on the occasion of this hunting trip before deceased left the same premises. If defendant was so greatly concerned as to who should carry his hunting sack, it seems reasonable to believe he would have taken it himself. Again, it is unreasonable to believe that deceased would make a deadly assault upon defendant merely because defendant had asked him for the hunting sack. Also, defendant's story of how the killing occurred does not bear the earmarks of truthfulness when he states that at the time deceased called him a son of a bitch he, the defendant, was looking down, that when he turned and looked up deceased had his gun "in a killing position." All this occurred before defendant, according to his own statement, made any effort to protect himself against the alleged deadly assault of deceased. Nothing intervened to prevent deceased, if he had his shotgun "in a killing position," from shooting defendant, yet defendant says, and it is uncontradicted that deceased did not fire a single shot at defendant, although after deceased got his gun "in a killing position," defendant must necessarily have removed his gun from under his left arm to his shoulder and fired two times at deceased. Again, defendant says the first shot did not seem to have any

effect on deceased, and that after deceased was hit in the leg with the first shot he still advanced upon defendant, but failed again to shoot, and defendant then fired the second shot. That the killing occurred under such circumstances is unreasonable. Had sucn been the truth, undoubtedly defendant would not have lived to tell his tale. Both Manley and Sam Thompson testified that the two shots were fired "one right after the other," and Manley Thompson is the brother-in-law of defendant.

It is contended that the evidence is insufficient to sustain the conviction. The issue of the guilt of this defendant of the crime of murder was not submitted to the jury. Only the questions of his guilt of manslaughter in the first degree or whether the killing was justifiable in self-defense were submitted. The trial court took the most favorable view to defendant of the evidence in this case in submitting only the question of guilt of manslaughter in the first degree. The jury would have been authorized to infer a design to effect death from the fact of the killing itself, and, further, premeditation sufficient to constitute murder may be formed instantly before committing the act. The homicide here was committed with a deadly weapon, and defendant must have been presumed to intend the natural consequences usually following the use of such a weapon.

Furthermore, the court instructed by instruction No. 3:

"If you find that deceased made violent epithets at the time of the shooting against defendant, and that because of such words or epithets only defendant drew his gun and shot deceased, and that thereafter deceased died, by reason of such wounds, but that defendant did

not intend to kill deceased when he shot him, then and in that event defendant would be guilty of manslaughter in the first degree and in such event you should find him guilty of manslaughter in the first degree."

We do not understand the law to be that the use of violent epithets or threats, directed by deceased against a defendant, by reason of which defendant draws his gun and shoots deceased, will mitigate a homicide. Evidence of threats are admissible when part of the res gestae, and also when there is evidence first introduced tending to show that deceased at the time he was killed was making some overt act or demonstration which furnished defendant reasonable cause to believe he was in danger of being killed or receiving great bodily injury at the hands of deceased. But the fact that deceased called defendant a "son of a bitch" would not alone tend to justify the use of a deadly weapon by defendant, nor in any way tend to mitigate the degree of the homicide so as to reduce it from murder to manslaughter.

Apparently the state did not urge a conviction of this defendant of the crime of murder, and the foregoing instruction is only cited for the purpose of showing that defendant got the benefit of a theory in mitigation of the offense much more favorable to him than the evidence or the law warrants, disclosing that if any error was committed in the trial of this case, it was such that resulted to the benefit of defendant.

In connection with the insufficiency of the evidence, it is further urged that defendant ought not to have been convicted, because it is undisputed that neither of the wounds inflicted were necessarily fatal, and that death would not have resulted except for the fact that

proper care was not taken of the wounds, and that septic poisoning set up in the wounds, death resulting from the poisoning and not because of the fatal nature of the wounds themselves. The wounds caused the poisoning to set up. Defendant cannot escape responsibility for the death because of the intervening cause of the poisoning. Such is not the rule in this jurisdiction. The rule here is as stated in 21 Cyc. 700:

"If a wound or other injury cause a disease, such as gangrene, empyema, erysiphelas,, pneumonia, or the like, from which deceased dies, he who inflicted the wound or other injury is responsible for the death. * * * He who inflicted the injury is liable even though the medical or surgical treatment which was the direct cause of the death was erroneous or unskillful, or although the death was due to negligence or failure by the deceased to procure treatment or take proper care of the wound."

See, also, *Bishop v. State,* 73 Ark. 568, 84 S. W. 707; *Crum v. State,* 64 Miss. 1, 1 South. 1, 60 Am. Rep. 44; *Kelley v. State,* 53 Ind. 311; *State v. Foote,* 58 S. C. 218, 36 S. E. 551.

The only near exception to the above rule is found in the state of Texas, where by statute it is provided that upon the infliction of a wound not necessarily fatal, if by gross negligence on the part of the person who received the wound or persons having his custody, the person wounded is permitted to die by gross negligence, the person inflicting such wound cannot be held guilty of homicide. But as there was no showing of gross negligence on the part of the person injured in this case, that rule could not even be invoked were such a statute in effect

in this state. . On the contrary, it is shown that deceased was treated by a regularly licensed physician, upon whose suggestion deceased was taken to a hospital in the city of Muskogee for treatment, at which place he died.

Certain objections are urged to one paragraph of the court's instructions. We have carefully examined the instructions as a whole, and find them more favorable to defendant than the law and evidence in this case would warrant. Defendant was found guilty only of manslaughter in the first degree, and the punishment to be imposed was fixed by the jury at five years' imprisonment in the state penitentiary, practically the minimum for such offense. When the instructions are considered as a whole, if it be admitted that certain paragraphs when considered separately were technically incomplete, it cannot be said that the charge as a whole deprived defendant of any constitutional or statutory right, or resulted in a miscarriage of justice.

After a full consideration of all points urged by counsel for defendant and assigned as reasons for reversal of the judgment, we conclude that none of the errors complained of were such as to deprive the accused of that fair and impartial trial which is accorded under the Constitution and laws of the state.

Judgment affirmed.

DOYLE, P. J., and BESSEY, J., concur.