## HALL v. STATE OF INDIANA.

[No. 25,337.    Filed January 6, 1928.]

1. CRIMINAL LAW.—*Rule as to accused being brought before court for trial without shackles.*—Ordinarily, the accused must be brought into court for trial without irons or being in any manner shackled, but a different rule prevails where the defendant is a desperate and dangerous criminal and there is evident danger of his escape or of harming those about him.    p. 600.

2. CRIMINAL LAW.—*Discretion of court in ordering defendant restrained in reasonable manner during trial.*—Where the trial court has good reason to believe that the defendant is a desperate and dangerous criminal, and that there is serious danger of his harming those about him in the courtroom or of his attempting to escape or being released by others, it may, in the exercise of a sound and enlightened discretion, order him restrained in such reasonable manner as it deems necessary, and the court's action in so doing will not be error unless there has been a clear abuse of discretion.    p. 600.

3. CRIMINAL LAW.—The court may refuse to order an accused to be unshackled during the trial on knowledge gained from sources other than evidence offered at the trial.    p. 603.

4. CRIMINAL LAW.—*Refusing to sustain motion requiring removal of leg irons from defendant during trial not error.*—Where the defendant was on trial for murder while he and another were engaged in robbery, both armed with revolvers which they threatened to use, and the· defendant had made a desperate but unsuccessful attempt to escape from jail and his codefendant had escaped, and defendant had secured a revolver while in jail and shot at the sheriff with it, and the court had been informed that an effort might be made to release the prisoner during the trial, there was no error in overruling defendant's motion to order the removal of leg irons from his ankles during the trial.    p. 603.

5. CRIMINAL LAW.—A liberally wide latitude should be allowed in the cross-examination of witnesses, especially expert witnesses.    p. 604.

6. CRIMINAL LAW.—*Excluding questions to physician on cross-examination was harmless where same testimony available by recalling witness.*—In a prosecution for murder, where the defendant was charged with clubbing the deceased over the head with a revolver and fracturing his skull, resulting in his death ten days later, excluding questions on cross-examination of a physician who performed an autopsy as to treatment of the wound was harmless, as the defendant could have recalled the physician as his own witness, but he made no attempt to show that the cause of the death was maltreatment of the wound.    p. 604.

7. CRIMINAL LAW.—*Excluding question to physician on cross-examination was not error where question was substantially answered*

*in response to another question.*—In a prosecution for murder, where the defendant was charged with beating the deceased over the head with a revolver and fracturing his skull, the exclusion of a question to a physician on cross-examination as to whether an X-ray picture should have been taken was not error, where it was substantially answered in response to another question. p. 605.

8. CRIMINAL LAW.—*Sustaining state's objections to questions to physician on cross-examination was harmless where answer thereto could not have changed result.*—In a prosecution for murder, where the defendant was charged with beating his victim over the head with a revolver and fracturing his skull, sustaining objections to questions on cross-examination of a physician as to treatment of the victim's wounds was harmless where favorable answers thereto would not have authorized a verdict of acquittal. p. 606.

9. HOMICIDE.—*If wound causes death indirectly, as by blood poisoning developing therefrom, he who inflicts the wound is responsible.*—It is not indispensable to a conviction for murder that a wound should be fatal and the direct cause of death, since, if the wound caused death indirectly through a chain of natural causes and effects, unchanged by human action, such as the development of blood poisoning therefrom, he who inflicted the wound is responsible. p. 607.

10. HOMICIDE.—*One who inflicts a serious wound on another may be guilty of murder although improper medical treatment may contribute to the death.*—A person who inflicts a serious wound upon another, calculated to destroy or endanger his life, will not be relieved of responsibility, though unskilled or improper medical treatment aggravates the wound and contributes to the death. p. 608.

11. CRIMINAL LAW.—*Criminality of an act is not diminished by other causes contributing to result.*—Every person is held to contemplate and be responsible for the natural consequences of his own acts, and the criminality of an act is not altered or diminished by the fact that other causes co-operated in producing the result. p. 608.

12. HOMICIDE.—*Evidence held to negative claim that death resulted from maltreatment of wounds inflicted by defendant.*—In a prosecution for murder, where the defendant was charged with beating his victim over the head with a revolver and fracturing his skull, death resulting ten days later from blood poisoning from the wounds inflicted, the evidence was held to negative the claim that the death was caused by maltreatment of the wounds. p. 609.

13. CRIMINAL LAW.—*Question put to state's witness on cross-examination as to whether he had seen article in local paper properly excluded.*—In a prosecution for murder committed while robbing a store, where state's witnesses testified that men held in jail as suspects were not the men who had robbed their employer's store, question put to such witness on cross-examination as to whether he had seen a certain

article in a local newspaper was properly excluded.    p. 610.

14.    CRIMINAL LAW.—*Court properly admonished jury to disregard remarks of counsel and newspaper article that had been shown to them by counsel.*—In a prosecution for murder, where the defendant's attorney, in cross-examining the state's witnesses, asked them whether they had seen a certain article in a local paper, but, the question being excluded, afterward held up the paper so that the jury might see the headlines and remarked that they had the case solved there, the court properly admonished the jury to disregard the remarks of counsel and to understand that the newspaper was not in evidence.    p. 610.

15.    WITNESSES.—Cross-examination of one witness upon matters not covered in direct examination cannot be had for the purpose of impeaching another witness.    p. 611.

16.    WITNESSES.—*Exclusion of question as to another witness' statement as to his uncertainty about identification of parties suspected of crime held proper.*—In a prosecution for murder, where the state's witnesses had visited the jail to identify some suspects that had been arrested, a question put to one of them, on cross-examination, as to whether his companion had not said he was not certain, was properly excluded.    p. 611.

17.    CRIMINAL LAW.—*Testimony that escaped codefendant in crime of murder while robbing store was known by several aliases was properly received.*—In a prosecution for murder committed while defendant and another were robbing a store, testimony that defendant's codefendant, who had escaped, was known by a number of aliases, was not objectionable on the ground that the fact that he had several aliases would "deprave" the character of one not on trial.    p. 612.

18.    CRIMINAL LAW.—*Admitting in evidence murder victim's revolver was not error where evidence showed defendant's connection with it after the murder.*—In a prosecution for murder committed while defendant and another were robbing a storeroom, admission in evidence of a revolver that had belonged to the victim was not error where a witness for the state testified that he had found the revolver in a woman's room which the two defendants frequented, the woman testified to having taken it from the codefendant's coat after the robbery, and defendant's connection with it was otherwise shown.    p. 612.

19.    HOMICIDE.—*Testimony that defendant had possession of revolver on another occasion not inadmissible as showing commission of another offense.*—In a prosecution for murder committed while defendant and another, armed with deadly weapons, were robbing a storeroom, where a good-faith effort was made by the state to have a witness identify a revolver she saw in defendant's possession as the one used by him in the robbery, evidence that the witness subsequently saw the two bandits with three revolvers in their hands, was not inadmissible on the theory that it showed the commission of another offense.    p. 613.

20. HOMICIDE.—*Articles including cartridge belt full of ammunition, revolver holster and cartridge box found in automobile occupied by defendants when arrested, and envelope found in room occupied by them, were admissible in evidence.*—In a prosecution for murder committed while defendant and another, armed with deadly weapons, were robbing a storeroom, a black Boston bag found in the automobile occupied by the defendant and a codefendant when they were arrested containing a leather revolver holster and a cartridge belt full of ammunition and also part of a cartridge box and an envelope addressed to accused found in a room which had been occupied by the two bandits, were admissible in evidence. p. 614.

21. CRIMINAL LAW.—*Subsequent acts and conversations of codefendants relative to crime admissible against either of them.*—In a prosecution for a crime committed by two persons, their subsequent acts and conversations relative to the crime are provable against either of them as admissions against interest. p. 614.

From Elkhart Superior Court; *William B. Hile,* Judge.

John Hall was convicted of murder while perpetrating a robbery, and he appeals. *Affirmed.*

*Frank B. Coughlin* and *Paul V. Paden,* for appellant.
*Arthur L. Gilliom.* Attorney-General and *Edward J. Lennon, Jr.,* Deputy Attorney-General, for the State.

MARTIN, J.—Appellant was indicted jointly with one Thomas O'Brien, alias Thomas Young, in three counts, the second of which charged the crime of murder while engaged in the perpetration of robbery. Appellant was tried separately by a jury which returned a verdict of guilty upon the second count of the indictment and fixed his punishment at death. Upon the verdict the court pronounced the judgment from which this appeal is taken.

The overruling of appellant's motion for a new trial is assigned as error. Sixty-seven reasons in support of this motion are given, those relied upon here for reversal are: that the verdict is contrary to law and is not sustained by sufficient evidence, that the court erred in compelling appellant to be shackled with leg irons during the trial, and that the court erred in admitting and ex-

cluding certain evidence, which will be hereinafter considered.

The appellant introduced no evidence at the trial. The facts shown by the state's witnesses are briefly as follows: The deceased, Louis C. Kreidler, who operated a drug store in South Bend, went to a bank at 9 a. m. Monday, March 26, 1926, to get money to cash checks at his store for employees of the Studebaker Corporation. At 9:15 a. m., just before Kreidler returned, the appellant Hall, who at the time was twenty-one years old, and O'Brien "held up" the drug store. Hall entered first and, at the point of a revolver, compelled Royal Gould, a young drug clerk, and Elva Collins, a customer, to hold up their hands and go into a back room, saying twice, "Get into the back room before I blow your head off." There he went through their pockets and robbed them, taking from Gould a small 25 caliber automatic pistol, as well as his money.

O'Brien entered the store after Hall, and proceeded to rifle a cash register. William B. Shaffer, another customer, came in, and mistaking O'Brien, who was at the cash register back of the soda fountain, for a clerk, asked for a bottle of ink. O'Brien compelled Shaffer to go into the back room, saying, "Get into the back room or I'll shoot you full of holes."

Mr. Kreidler, returning to the store and seeing O'Brien, said, "What are you doing in that office?" O'Brien said, "Get in the back room with the rest of them." A scuffle and fall ensued, a gun snapped but did not fire, O'Brien called to Hall: "Come and help me." Hall backed out of the room where, at the point of a revolver, he was holding Gould, Collins and Shaffer and joined O'Brien.

Witnesses heard a scuffling, blows being struck, "something like a chair falling over" or "like somebody had broken a box." Witness Shaffer, from the back

room, saw a motion at arms length toward Kreidler, who was almost down, by "the man who had been in the rear of the store" and "heard an awful crack" twice.    Witness Collins said he then saw Hall open the cash register in the front part of the store (on the cigar counter) and take money.    The witness then heard sounds of the men running out of the store.    Mr. Kreidler jumped up and followed the men out into the street calling, "Hold up" or "Robbers" and "Help."    Kreidler had two or three wounds on his head and over his eye and bled profusely, one witness said he looked like someone had thrown a bucket of blood over his head.    Dr. Walter H. Baker, a duly licensed physician, fifty years of age, was called and arrived in about ten minutes and attended Mr. Kreidler.    Dr. Baker cleansed the wounds on Kreidler's head, put on an antiseptic dressing, sent him home, a half-mile distant, in an automobile and put him to bed. Thereafter he attended him every day.    About five days after the robbery, Kreidler began to run a fever and the doctor found pus in his urine.    He had swellings in his left foot, left great toe and right ankle, chills, sweats and a toxic appearance indicating a streptococcic septicaemia or blood poisoning, which had developed from the injury to his skull.    Dr. Baker gave a saline injection, supplied water and packs to his head to increase the drainage from the wound and requested Dr. Harry L. Cooper, a licensed physician, who was a university graduate with a hospital interne experience and three years practice of medicine, specializing in internal medicine, as a medical consultant to assist in the treatment of Mr. Kreidler.    Kreidler was removed to a hospital on April 3, was given a large amount of saline or salt solution and an intravenous injection of gentian violet and some asperin.    At the hospital, he sank rapidly.    The loss of blood at the time he was wounded reduced the vitality of Kreidler, who was fifty-two years

old, and reduced his power of resistance against the blood infection. There was an increase of temperature, which was down and up, to 106 degrees. He developed paralytic ileus or paralysis of the bowels and had acute suppression of the urine, caused by profound toxemia or blood poisoning. He died on April 5, 1926.

Dr. Charles B. Crumpacker, a licensed physician and surgeon, graduate of several medical colleges, who had practiced medicine for twenty-one years, and had been coroner for six years, examined the body of Mr. Kreidler after his death and with Dr. M. W. Lyon, licensed physician and pathologist, with an army and hospital experience and ten years practice of pathology, and Dr. Harry L. Cooper performed or directed a post mortem operation, after the body had been treated by the undertakers. As coroner, Dr. Crumpacker reported the death as being caused by blood poisoning following a fractured skull, i. e., meningitis, inflammation of the brain or blood poison caused by some micro-organism or germ which produced a general infection of the entire body.

Dr. Cooper stated that in his opinion the man died from an infected fracture of the skull causing inflammation of the thin covering of the brain—the meninges. The fracture of the skull was circular in shape and about the size of half a dollar. Both layers of the right frontal bone, the inner and outer tables, and the porous structure between the tables were fractured, the inner break being larger than the outer. The fracture could not be noticed from observation, but would have been disclosed by an X-ray.

Mr. Kreidler was not rendered unconscious at the time Hall wounded him. Dr. Baker testified that he noticed no pus formation in or around the wound and diagnosed the case as trauma of the skull, and neither Dr. Baker nor Dr. Cooper discovered that the skull was fractured until after the post mortem.

In addition to the positive identification of appellant by the two men (Gould and Collins) whom he held up and robbed in the back room of the store, there were other items of corroborating evidence, one of which was as follows:

After the robbery and assault on Mr. Kreidler, three pieces of the rubber grips of a revolver, one piece of which had the corner broken off, together with Kreidler's spectacles were picked up from the drug-store floor. When Hall and O'Brien were arrested, May 10. 1926, in the company of "Red" Prough, who admitted a long criminal and prison record, they had, in their automobile, shoes and dresses and a black leather Boston bag which contained, among other things, wrenches, chisels, a jimmy, three flash lights, ammunition, a large Colt's revolver and two smaller revolvers. The large revolver was the same size as the gun used by Hall during the hold up and its grips had been replaced with pieces of a cigar box held on by white adhesive tape. The pieces of rubber grips found in the drug store not only fitted this revolver but the gun was tarnished at the places where the broken corner of the rubber grip was missing, and certain scratches on the gun and on the grip matched. Prough testified that he had furnished the pieces of cigar boxes and the tape and that Hall and O'Brien had repaired the gun shortly after the date of the hold up.

The sheriff of Elkhart county testified that he found, between appellant's cell and the steel wall of the jail, a letter written by the appellant, with whose handwriting he was quite familiar. This letter, dated August 4, 1926, stated that Hall and O'Brien would go up for trial on September 27, that "we may get the chair, the least we expect is life in Michigan City State Prison," and that "Red Prough snitched on us, he sent us to the chair for a few old dollars that the state gave him, he turned on us." (It appeared in evidence that a reward of

$700 was offered for the capture and conviction of the Kreidler murderer).

Appellant insists that under Art. 1, §13, of the Constitution, §65 Burns 1926, providing that "the accused shall have the right to a public trial by an impartial jury" and Art. 1, §15, Constitution, §67 Burns 1926, providing that "no person arrested or confined in jail shall be treated with unnecessary rigor" it was error for the trial court to refuse to sustain in full his motion objecting "to the shackling and handcuffing, as well as the ankle bars on the defendant during the process of the trial and to any shackling of the defendant whatever for the reason that it tends to prejudice the jury" against him.

The court in ruling on appellant's motion said: "Let it appear on the record that by virtue of the fact that the defendant had attempted to escape prison on at least one occasion and that his codefendant did escape prison, and for the reason further that the defendant on one occasion secured the revolver of an officer while in prison and shot the same directed at the sheriff, and for the further reason that it has come to the attention of the court that some effort might be made to release the prisoner during the trial, the objection is sustained with the exception as to the hobbles or leg irons which are ordered maintained on the defendant's person during the trial."

Blackstone early stated the law to be (4th Com. 332) that: "The prisoner must be brought to the bar without irons or in any manner of shackles or bonds, 1, 2. unless there be evident danger of escape, and then he may be secured with irons," and the courts have uniformly held that a defendant in a criminal trial is always entitled to appear unfettered if he properly conducts himself while under arrest and during the trial. But where the trial court has good reason to believe that

the defendant is a desperate and dangerous criminal and there is serious danger of his harming those about him in the court-room or of his attempting to escape or being released by others, it may exercise its sound and enlightened discretion and order him restrained in such reasonable manner as it deems necessary. See cases cited in 16 C. J. 819; 8 R. C. L. 68; Note, 5 Ann. Cas. 959; Note, 39 L. R. A. 821, and the action of the court in so doing will not be error unless there has been a clear abuse of discretion. *Gray* v. *State* (1924), 99 Texas Crim. Rep. 305, 321, 268 S. W. 941; *Territory of New Mexico* v. *Kelly.* (1882), 2 N. M. 292; *Poe* v. *State* (1882), 10 Lea (Tenn.) 673. In the modern court-room, as little show of arms must be made as possible and ordinarily the necessary restraint can be accomplished by placing ununiformed guards near the prisoner. *State* v. *Kenny* (1907), 77 S. C. 236, 57 S. E. 859; *State* v. *Duncan* (1893), 116 Mo. 288, 22 S. W. 699; *State* v. *Rudolph* (1904), 187 Mo. 67, 85 S. W. 584; or, as was done in this case, by shackling his ankles. *Faire* v. *State* (1877), 58 Ala. 74, 82.

While the appellant admits that the necessity for a prisoner to be restrained by shackles or manacles during the trial must be left to the sound discretion of the trial judge, as decided by this court in *McPherson* v. *State* (1912), 178 Ind. 583, 99 N. E. 984, he maintains that there must be some evidence offered to the court at the trial of imminent danger of escape or violence to others based upon the conduct of the prisoner at the time of the trial, to authorize the court to exercise its discretion to require physical restraint of the prisoner and cites *State* v. *Kring* (1877), 64 Mo. 591, and *State* v. *Williams* (1897), 18 Wash. 47, 50 Pac. 580, 63 Am. St. 869, 39 L. R. A. 821.

In the Kring case, *supra*, the prisoner had assaulted a person in court three months before the term at which he

was tried, and the court held that such fact "would hardly authorize the court to assume that, on his trial for life, he would be guilty of similar outrages." The court said:

"When the court allows a prisoner to be brought before a jury with his hands chained in irons, and refuses, on his application, or that of his counsel, to order their removal, the jury must necessarily conceive a prejudice against the accused, as being in the opinion of the judge a dangerous man, and one not to be trusted, even under the surveillance of officers. Besides, the condition of the prisoner in shackles may, to some extent, deprive him of the free and calm use of all his faculties."

The court expressly concurred in the judgment of the Court of Appeals of St. Louis from which court the final appeal was prosecuted. There, *State* v. *Kring* (1876), 1 Mo. App. 438, the court, after carefully discussing at length the early historical development of the law upon this subject, says: "It is not pretended in this case that there was danger of an escape. Had this danger existed, however, we are of the opinion that some other means must have been taken to prevent it, and that it would have been error, even then, to keep the prisoner's hands fettered in the presence of the jury during the trial of the case." The court pointed out, quoting Coke (who quotes Brocton and Fleta) 2 Inst. 315, that: "He shall not be brought before the justices with his hands bound, though sometimes, on account of danger of escape his feet are fettered," and, also, quoting Hawkins, 2 P. C. ch. 28, that he, "ought not to be brought to the bar in a contumelious manner, as with his hands tied together, or any other mark of ignominy or reproach, not even with fetters on his feet, unless there be some danger of a rescue or escape."

In *State* v. *Williams, supra,* the court, in holding that the trial court erred in refusing the request of the ap-

pellant that manacles be removed from two persons, one of whom was in the court-room as a witness, who had been jointly charged with the same crime as the defendant and found guilty, said: "It can hardly be conceived that there was any necessity for this incident to the trial, none appears in the record." The court in stating the rule says that the accused himself "was entitled to appear free of all manner of shackles or bonds . . . *unless there was evident danger of his escape.*" (Our italics).

Appellant's contention that the knowledge upon which a court bases its discretion to refuse a prisoner's request that fetters be removed from his legs must come only from evidence offered at the trial does not appear to us to be sound. The court, in ruling upon appellant's motion or request, stated certain facts upon which it exercised its discretion and based its decision. If the appellant contended that the facts so stated by the court were untrue, he should have controverted them and asked permission to show the true facts to the court by proper sworn testimony. But this he did not do, and there is nothing in the record to show that the facts stated by the court were untrue, but, on the contrary, facts were disclosed in evidence showing a very desperate and determined effort by appellant to escape when he disarmed an officer and used his revolver and was finally quelled only when the sheriff threatened to gas the jail. Evidence to the effect that this appellant had secured a revolver and shot at the sheriff, had attempted to escape, that his codefendant had escaped, and that effort might be made to release the prisoner during the trial, would seem to us to be more to his damage, than the fact that he sat during the trial with his feet fettered. See *Faire* v. *State, supra.*

Objections were sustained to three questions asked on the cross-examination of Dr. Crumpacker, the coroner,

the first question being: "Whether or not the placing of metal clips upon that wound and putting that gauze on the outside, keeping out the air, and stopping the drainage coming out, was the proper way to treat Mr. Kreidler?" the second asking, "Would you say it would be ordinary to take an X-ray?" and the third asking, "Could it have been possible or would you say from your examination of that man, that the poison could have started from the pulling of that skin together and the intersection of the skin scraping on the bone within that layer that was fractured?"

These questions, it would seem, were asked in pursuance of appellant's theory or contention that Mr. Kreidler's wound in the head received improper or incompetent medical treatment, and that the cause of his death was the doctor's treatment, or a disease brought on by the wound or by the treatment, and not the act of the appellant.

The record shows that the court sustained the state's objection to the first of these questions because it was not proper cross-examination and "that the only expert opinion given by the doctor was that Mr. Kreidler died from blood poisoning following a fractured skull and that the contention of counsel for the defense that Mr. Kreidler died from 'poor medical treatment' would be wholly a matter of defense and at the proper time the defense could make the doctor their own witness."

The appellant did not in any manner attempt to show (other than by these questions, if they can be so considered) that the cause of death was maltreatment of the wound. In such a case it has been held that the state's objection to such a question was properly sustained, *State* v. *Strong* (1900), 153 Mo. 548, 554, 55 S. W. 78. While we believe that a liberally wide latitude should be allowed in the cross-examination of witnesses, especially expert witnesses, and that the

court might reasonably have permitted these questions to be answered, (although, as seen, there is authority holding the questions objectionable), yet the appellant could not in any manner have been harmed by the exclusion of this evidence on cross-examination of the state's witness because he could have recalled the coroner as his own witness at the proper time if he so desired.

Appellant's question regarding an "X-ray" was subsubstantially answered in response to another question which he asked as follows: "Q. It is usually customary in a case of that kind to take an X-ray, is it not, Doctor, previous to putting on clips or a bandage? A. No, that is a pretty broad question— a man might come in with a little cut on his arm or his head and it would not be necessary or customary to take an X-ray."

Appellant's questions regarding the clips were propounded under the apparent assumption that clips had been placed on the wound by Dr. Baker sometime before death, and that the clips had prevented drainage of the wound. All the doctors agreed that a wound should not be closed up without drainage and Dr. Baker testified that he did not put any metal clips on the wound at any time and that he left the wound open. Dr. Cooper testified that when he was called into the case as a consultant, streptococcic septicaemia had set in and his treatment was for that; that there was a dressing on Mr. Kreidler's head but that he did not see or examine the wound before the post mortem. Dr. Crumpacker's testimony on cross-examination on this point was as follows: "Q. Was there any other laceration there at that point outside of the fracture? A. The skin was open—it had been fastened with metal clips. . . . Q. Now I understand you to say there were fastened on his head some metal clips, do you mean the skin was fastened with the metal clips? A. The skin was fastened with metal

clips instead of being fastened with cat gut or other suture material. Many physicians use metal clips instead of the ordinary materials such as cat gut. Q. Could you tell Doctor just by looking at that wound when those metal clips were put on? A. No. Q. Is it customary, Doctor, to put metal clips on a man when he comes in with a mark on his skull? A. Many surgeons use the clip rather than any other suture material. It is just a matter of choice of the surgeon. Q. Just a matter of choice? A. Yes. . . .Q. From your observation, Doctor, how long would you say those metal clamps had been on there? A. I couldn't answer that. Q. You can't answer that! A. No, I don't know whether they had been put in and removed and new ones put in, or whether they had been put on at first or later —I couldn't answer that."

Dr. Lyon testified at the time of the post mortem examination (about which Dr. Crumpacker was testifying) that: "The wound was on the right side of the head in approximately this position (indicating). It was a superficial skin wound which had been successfully fixed up and camouflaged by the undertaker. . . ."

The undertaker testified that he removed the body from the hospital to the undertaking establishment, at which time he removed the bandage from the head, and that the slight cut upon the head was open and that there were no metal clips holding it together. He told of sewing up the wound with a needle and thread "later," but it does not appear from his testimony whether this was before or after the post mortem operation was performed.

Any possible error of the court in sustaining the objections to the three questions asked Dr. Crumpacker is rendered harmless for the additional reason that

8. answers entirely favorable to appellant would not have required or authorized the jury to have rendered a different verdict, in view of the following

principles of law:   In Hale, Pleas of the Crown p. 428, it was said:   "If a man gives another a stroke, which, it may be, is not in itself so mortal, but that with good care he might be cured, yet if he dies of this wound within the year and a day, it is homicide or murder, as the case is, and so it hath been always ruled.   But if the wound or hurt be not mortal, but with ill applications by the party, or those about him, of unwholesome salves or medicines, the party dies, if it can clearly appear that this medicine, and not the wound, was the cause of his death, it seems it is not homicide, but then that must appear clearly and certainly to be so.   But if a man receives a wound, which is not in itself mortal, but either for want of helpful applications, or neglect thereof, it turns to a gangrene, or a fever, and that gangrene or fever be the immediate cause of his death, yet this is murder or manslaughter, in him that gave the stroke or wound, for that wound, though it were not the immediate cause of his death, yet, if it were the mediate cause thereof, and the fever or gangrene was the immediate cause of his death, yet the wound was the cause of the gangrene or fever, and so consequently is *causa causati.*"

This doctrine, developed long before the era of modern medical science, is still recognized as a wise and salutary rule of law by the many cases which have considered: (A)   Death resulting from a disease caused by a wound or injury; and (B) death resulting from the treatment of an injury.

(A)   It is not indispensable to a conviction that a wound be necessarily fatal and the direct cause of death. If the wound caused death indirectly through a chain of natural effects and causes, unchanged by human action, such as the consequential development of septicaemia or blood poisoning, he who inflicted

the wound or injury is responsible.[1]   *Kelly* v. *State* (1876), 53 Ind. 311, 315; 29 C. J. 1080, §55, note 16; 13 R. C. L. 752, §58, note 4; notes:   51 L. R. A. (N. S.) 877; Ann. Cas. 1916C 693.

(B)   A person who inflicts a serious wound upon another, calculated to destroy or endanger his life, will not be relieved of responsibility even though unskilled or improper medical treatment aggravates the wound and contributes to the death. Every person is held to contemplate and be responsible for the natural consequences of his own acts, and the criminality of an act is not altered or diminished by the

---

[1] Thus defendants were held responsible where death was caused by peritonitis resulting from a knife stab in the bowels, *Bishop* v. *State* (1905), 73 Ark. 568, 84 S. W. 707; by septic poisoning from gunshot wounds, *Harrison* v. *State* (1921), 18 Okla. Crim. Rep. 403, 195 Pac. 511; by erysipelas resulting from a knife wound, *Denman* v. *State* (1883), 15 Nebr. 138, 17 N. W. 347; by lockjaw resulting from knife wounds, *State* v. *Harmon* (1915), 5 Boyce (28 Del.) 296, 92 Atl. 853; by pneumonia resulting from a stab with a knife, *State* v. *James* (1913), 123 Minn. 487, 144 N. W. 216; by sepsis or blood poisoning resulting from an automobile wreck by a drunken driver, *People* v. *Townsend* (1921), 214 Mich. 267, 183 N. W. 177; by septicaemia resulting from a pistol wound, *Clements* v. *State* (1914), 141 Ga. 667, 81 S. E. 1117.

This rule has been held to apply not only where the consequential development is in the form of an immediate infection of the wound itself, as in the foregoing cases, but also where the condition developing is anatomically disassociated from the mere external wound as by miscarriage resulting from a kick in the stomach, *People* v. *O'Connell* (1894), 78 Hun. 323, 29 N. Y. Supp. 195; by pleuro-pneumonia resulting from bruises and blows, *Burnett* v. *State* (1884), 14 Lea (Tenn.) 439; by empyema resulting from blows with the fists and feet, *State* v. *Wood* (1900), 112 Iowa 411, 84 N. W. 520; by fever resulting from a beating, *United States* v. *Woods* (1834), 28 Fed. Cas. 762 (No. 16760) 4 Cranch C. C. 484; by septic peritonitis resulting from a miscarriage caused by a pistol wound, *People* v. *Kane, infra* 609; by peritonitis resulting from a gun-shot wound in the leg, *State* v. *Foote* (1899), 58 S. C. 218, 36 S. E. 551; by pneumonia resulting from an inordinate whipping with switches, *State* v. *Chiles* (1895), 44 S. C. 338, 22 S. E. 339; by traumatic pneumonia resulting from wounds, *State* v. *Wilson* (1905), 114 La. 398, 38 So. 397; by congestion of the brain or exposure resulting from blows on the head with a hammer, *Kelly* v. *State, supra.*

Where, however, the wound is not in its nature mortal, and death results solely from an entirely independent cause not traceable in any way to the wound, the person inflicting the wound cannot be held responsible for the death, *Quinn* v. *State* (1914), 106 Miss. 844, 64 So. 738; *Treadwell* v. *State* (1884), 16 Texas App. 560; *Bush* v. *Commonwealth* (1880), 78 Ky. 268; *Livingston* v. *Commonwealth* (1857), 14 Grat. (Va.) 593; note, 8 A. L. R. 520.

fact that other causes co-operated in producing the fatal result.[2]  *People* v. *Kane* (1915), 213 N. Y. 260, 107 N. E. 655, L. R. A. 1915F 607, and note, Ann. Cas. 1916C 685, 32 N. Y. Cr. 365; *Commonwealth* v. *Hackett* (1861), 2 Allen (84 Mass.) 136; *Lawman* v. *State* (1922), 18 Ala. App. 569, 93 So. 69; 13 R. C. L. 751, §57, notes 18 and 19; 29 C. J. 1081, §56, note 23; notes:  22 L. R. A. (N. S.) 841; 8 A. L. R. 516; 16 A. L. R. 608.

From the undisputed evidence in this case it is clear that the wound inflicted by appellant was a dangerous wound on a vital part of the body; that it caused the death of Kreidler by septicaemia through a chain of natural effects and causes unchanged by human action and that the death was not caused by maltreatment of the wound.  Both attending physicians appear to have been well qualified professionally, and all the evidence adduced negatives negligence or maltreatment.  No X-ray examination was made of the skull, but, since the wound was apparently superficial, and since Mr. Kreidler did not lose consciousness after the blow, and showed no other signs of compression or concussion, the doctor had no reason to believe that the skull had been fractured.[3]

[2] "One who inflicts an injury upon another . . . is not responsible however, where death results solely from erroneous or unskillful treatment of the injury," 29 C. J. 1081, §56, and "of course if it clearly and certainly appears that the maltreatment of the wound, or the medicine administered, or the deceased's own misconduct, and not the wound, was the sole cause of death, the person inflicting the wound will not be liable therefor," 13 R. C. L. 751 §57.

[3] If the fracture had at once been discovered and a surgical operation had been immediately performed to relieve the pressure on the brain, we have no means of knowing what the result might have been.  Even then the blood poisoning might have occurred, or death may have followed the operation.  Where one who has received a wound calculated to produce death dies during a necessary surgical operation performed in a good faith attempt to save life, the person who inflicted the wound is criminally responsible although the operation may have been the immediate cause of death.  *State* v. *Landgraf* (1888), 95 Mo. 97, 6 Am. St. 26, 8 S. W. 237; *Osborn* v. *Com.* (1884),

In the cross-examination of the state's witnesses, Royal Gould and Elva Collins, the appellant's attorneys interrogated these witnesses at length regarding their visiting the jail for the purpose of looking at and establishing the identity of three men, Betticks, Hayes and Fredericks, who, it appears, were first arrested and held as the possible perpetrators of the crime for which Hall was later tried. Collins testified that he was satisfied in his own mind that Betticks, Hayes and Fredericks were not the men he had seen in Kreidler's drug store and that he so expressed himself at the time he saw them in jail. Gould also denied having identified them. During the course of this cross-examination, Gould was shown a copy of a South Bend newspaper and asked a question concerning an article therein. Appellant's brief quotes the question as: "Have you ever seen that article in the paper that Hayes killed Kreidler?" The record shows the question to have been "Have you ever seen that article in the paper that Kreidler killed himself?" but the question in either form was improper and the objection was rightly sustained. After the appellant's attorney held up the newspaper before the jury showing the headlines and said, "They had the Kreidler case solved here," the court properly ad-

6 Ky. Law. Rep. 47; *Coffman* v. *Commonwealth* (1874), 10 Bush (73 Ky.) 495; *Commonwealth* v. *McPike* (1849), 3 Cush. (Mass.) 181, 50 Am. Dec. 727; *Reg.* v. *Davis* (1883), 15 Cox C. C. (Eng.) 174; *Daughdrill* v. *State* (1896), 113 Ala. 7, 21 So. 378; *People* v. *Cook* (1878), 39 Mich. 236, 33 Am. Rep. 380; in the absence of manifest negligence of the physicians or surgeons; *Garner* v. *State* (1903), 45 Texas Crim. Rep. 308, 77 S. W. 797; *Territory* v. *Yee Dan* (1894), 7 N. M. 439, 37 Pac. 1101; and it is no defense for one charged with murder to show that the deceased might have recovered if greater care or skill had been shown in his treatment, *State* v. *Garrand* (1874), 5 Ore. 156; *People* v. *Townsend* (1921), 214 Mich. 267, 183 N. W. 177, 16 A. L. R. 902; or that his death would not have ensued had the deceased been treated according to the most approved surgical methods, *State* v. *Edgerton* (1896), 100 Iowa 63, 69 N. W. 280; *State* v. *Seery* (1906), 129 Iowa 259, 105 N. W. 511; or that a surgical operation at the proper time would have saved the life of the deceased; *State* v. *Lane* (1900), 158 Mo. 572, 59 S. W. 965.

monished the jury to disregard the remarks of the defendant's counsel and to "understand that newspaper accounts are not evidence in this case.    This is not tried on newspaper accounts of any kind or character.    Only the evidence as it comes under oath from the witness stand is for your consideration here."

Collins, on cross-examination, referring to the time when he identified the appellant at the jail, was asked two questions to which objections were sustained: 15, 16. "You recall Mr. Gould saying at that time that he was not certain?" and "Isn't it a fact that, at the time, before you said anything one way or the other, Spilman (a police officer) told you that he was certain himself that Hall was the man and that you wouldn't be making any mistake in identifying him?"    Appellant cites *Bessett* v. *State* (1885), 101 Ind. 85, *Hyland* v. *Milner* (1885), 99 Ind. 308, Underhill, Crim. Law §356; and 40 Cyc 2716, to the point that it is proper to ask a witness if he did not, at a particular former time and place, give a different account of relevant facts to that which he gave in his direct examination.    Such a situation, however, is not shown to exist here.    The first question sought to impeach Gould's testimony. Cross-examination of one witness, upon matters not covered in direct examination, cannot be had for the purpose of impeaching another witness.    It may have been intended by the second question to lay the foundation for the impeachment of Collins' testimony, but the question was not sufficient for that purpose, since it did not ask the witness concerning any statement which he had made out of court inconsistent with his testimony given in court.    Underhill, Crim. Evidence (3d ed.) §380. If the questions were merely intended to present matters of defense, the objections were properly sustained because the question could have been asked at the proper time.    If they were asked only upon the pretense that

their object was impeachment when there was no reasonable ground to expect favorable answers or to be able to prove by direct evidence that unfavorable ones were false (and appellant offered no evidence in the defense of this case) it would seem that the sole tendency, if not the purpose of such questions, was to create suspicion in the minds of the jury. 40 Cyc 2569.

Objection was made by appellant to the introduction of the testimony of the witness Spilman to the effect that Tommy Young, Hall's codefendant was also "known by" the names, Thomas Felix Mullihan, Eddie Fox and Thomas O'Brien, for the reason that the "testimony was based purely on hearsay, and its purpose, if it had any, was purely to deprave the character of one who was not on trial." It does not appear from the record that the witness was testifying except from his own personal knowledge. Tommy Young or O'Brien was the partner in crime of the appellant, they occupied the same room at a rooming house, frequented resorts together, were arrested together, and were indicted for this crime together. All the competent facts concerning Young or O'Brien were important in this case and an objection on the ground that the fact that he had several aliases would "deprave" the character of this escaped bandit is frivolous.

Appellant moved to strike out all the evidence given by the witness Spilman pertaining to state's Exhibit 1, (Kreidler's revolver) "for the reason it was not connected up in any way with the defendant and was introduced wholly and solely to prejudice the jury against this defendant." Spilman testified that he found the revolver in the room of Helen Young in Elkhart, that he had shown it to various police officers, to Mr. Kreidler's widow and to clerks in the Kreidler drug store. These persons identified the revolver as belonging to the deceased, and William Kreidler, a brother of

the deceased, testified that it was the revolver that he had given to the deceased. some twenty-eight or thirty years before.   Helen Young testified that she had met Tommy O'Brien and John Hall at Red Prough's soft drink place in Elkhart and that they had "come out to our place with Red at 904 West Franklin," that O'Brien had "stopped in" at her rooms on occasions and that in the last of April or in May, 1926, she had taken this "little gun" out of his coat pocket "on the foot of my bed", and kept it in her sewing basket.   Frank ("Red") Prough, testified that O'Brien and Hall had the gun "along the last of April or the first of May  .  .  .  up to my room on Franklin street" that they were talking about it being no good and O'Brien said to Hall, "if it would have gone off I wouldn't have been here" and Hall said, "I had to give it to him."   From the foregoing, it appears that the evidence of officer Spilman concerning state's Exhibit No. 1, was quite positively "connected up" with the appellant.

Ruby Campbell, proprietress of the Canary Inn, a road house, testified that she saw Hall and O'Brien at her place on April 18, 1926, and that they had three revolvers in their hands.   She said she was then excited and would not be able to describe the guns, but one of them looked quite long.   Appellant contends that the court erred in permitting her to testify as to what she saw in their hands on the ground that "this evidence tended to show the commission of another offense subsequent to the one on charge and not connected with same in any manner."   We see no force in this objection.   An examination of the record discloses what appears to be a good faith effort on the part of the state to have the witness describe or identify the gun held by Hall as the same gun used in the Kreidler hold-up. She did not testify regarding any hold-up or unlawful act at her place.   (Her testimony could not even be held to

prove the carrying of concealed weapons or of carrying fire arms without a permit). It is therefore unnecessary to discuss here the question as to admissibility of evidence concerning separate offenses to establish intent, purpose and guilty knowledge.

Appellant also objected to the introduction in evidence of Exhibit 11, the black Boston bag found in the automobile occupied by Hall and O'Brien when they were arrested; Exhibit 6, a leather revolver holster and a cartridge belt full of ammunition (32-20 Western shells) which was in the bag; Exhibit 9, parts of a cartridge box (32-20 Western shells) and Exhibit 10, part of an envelope addressed to Hall. Exhibits nine and ten were found by a detective on April 22, 1926, in a scrap barrel at a rooming house in Elkhart where Hall and O'Brien roomed together, the proprietress of the rooming house having testified that she took them out of Hall and O'Brien's room after they had left her house. The only objections urged by appellant to the admission of these exhibits (11, 6, 9 and 10) is that "with the exception of Exhibit 10, they were in no way connected with the defendant, John Hall and . . . proved nothing pertaining to the issues of the case." It is patent that these exhibits were connected with appellant, were material to the issues and were properly submitted to the jury. See 30 C. J. 163, §383; Id. 164, 203, §433.

Appellant bases the last of his propositions upon the alleged error of the court in permitting the witness Prough to answer certain questions eliciting evidence of certain acts and conversations between appellant and Tommy O'Brien, contending that statements or admissions of coconspirators or codefendants subsequent to the commission of the offense and when the common enterprise is at an end are inadmissible, citing O'Neil v. State (1873), 42 Ind. 346;

*Kahn* v. *State* (1914), 182 Ind. 1, 105 N. E. 385; and other cases. These cases do not present the same question as the case at bar. Here the appellant was present at all times and participated in the acts and conversations detailed and his actions and statements are provable as admissions against interest.

The judgment is affirmed.