61 N.J. Super. 253 (1960)
160 A.2d 511
THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LOUIS TORZILLO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted April 25, 1960.
Decided April 29, 1960.
*254 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Louis Torzillo, appellant, pro se.
Mr. Bryan V. Moore, Legal Assistant, for respondent (Mr. Stanley E. Rutkowski, Mercer County Prosecutor, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant appeals from the County Court's denial, after a full hearing, of his motion to set aside his conviction and permit him to withdraw his non vult plea to three indictments charging him with breaking and entering, larceny and receiving stolen property. This is the second time the matter has been before us. On the first occasion we reversed a similar order of the County Court that had been entered without affording defendant a hearing, and remanded the matter for a full hearing. A few of the facts set out in our earlier opinion bear repetition.
In July 1954 the grand jury returned four indictments: Nos. 127 and 130 charged defendant and Pasquale Carlisi with breaking and entering, larceny and receiving on March 16 (Cooper residence) and March 19, 1954 (Jones residence) respectively. Nos. 128 and 129 charged defendant, together with Paul Bellino and Louis W. Hartel, with the same crime on April 29 (Standard Brands warehouse) and April 24, 1954 (Applegate apartment), respectively. Defendant and Carlisi stole a mink furpiece and jewelry worth $1,135 from the Cooper home, and a fur coat and jewelry worth $655 from the Jones residence. Defendant, Bellino and Hartel took a small truck and a considerable quantity of groceries, total value $5,000, from the Standard *255 Brands warehouse, and jewelry worth $23,740 from the Applegate apartment.
All four of the accused were represented by counsel of their own choice at the time of plea. Defendant pleaded not guilty to the four indictments; Carlisi non vult to the two brought against him; and Bellino not guilty and Hartel non vult to their indictments.
Defendant never made any statement concerning the crimes charged against him. However, Carlisi and Hartel made and signed statements implicating defendant in the crimes with which they were charged. The statements were in great detail, describing the inception and execution of the crimes step by step, as well as their aftermath. Defendant planned and carried out all four, and it was he who undertook to get rid of the loot through "fences."
Defendant and Bellino went to trial before a jury on indictment No. 128 (Standard Brands) on September 22, 1954. The next morning, and before the trial resumed, the assistant prosecutor showed defendant the Carlisi and Hartel statements in the presence of his counsel, as well as a letter which defendant had prepared and had Carlisi copy (the letter exculpated defendant), and the report of an expert identifying the letter as being in defendant's handwriting. Defendant thereupon decided to change his plea. Through counsel he withdrew his pleas of not guilty to all the indictments, including the one then being tried, and entered pleas of non vult. Bellino also withdrew his not guilty pleas and pleaded non vult.
Defendant has not supplied us with a transcript of the hearing, although one was made available to him. Nonetheless, we have thoroughly reviewed the transcript, the Carlisi and Hartel statements, and all the files. We find nothing that even suggests that defendant, a court-wise criminal, did not voluntarily and understandingly change his plea. There were no threats made or promises or inducements given. At the County Court hearing defendant explicitly stated for the record that he was not claiming the *256 assistant prosecutor had committed any impropriety or made any promise. He also conceded there was no impropriety in the conduct of his own counsel.
Before defendant appeared in court for sentence on October 15, 1954, Carlisi, who was involved with defendant in indictments Nos. 127 (Cooper) and 130 (Jones), wrote to the prosecutor and the sentencing judge that he alone had committed the crimes charged. He sent a similar letter to the two detectives who had taken his statements at the time of his arrest.
The sentencing judge had Carlisi's letter before him, as well as defendant's criminal record which showed that he had been convicted for murder in 1929 and, upon release some ten years later, had successively been imprisoned for the crimes of breaking, entering and larceny, burglary and robbery. That record also revealed his extensive involvement with the criminal authorities for offenses which resulted either in dismissal or in no prosecution. At the time of sentence for the four crimes in question he was a man thoroughly experienced in crime and criminal procedure.
Defendant received State Prison terms of 5-7 years on each of indictments Nos. 128 and 129, to run consecutively. Similar sentences were imposed on indictments Nos. 127 and 130, to run concurrently with each other and concurrently with the sentence imposed under No. 128.
Defendant does not now, nor did he on the first appeal, question his plea or the sentence imposed under indictment No. 128. When last before us he claimed his non vult pleas to Nos. 127, 129 and 130 were the result of his being "overborne" by his counsel and the prosecutor. This claim did not impress us at that time nor does it now, particularly in the face of defendant's unqualified statement at the hearing that he was not now claiming impropriety in the conduct of his counsel or the assistant prosecutor. We found a similar lack of merit in his claims that the sentencing judge had relied upon a false criminal record and had wrongfully taken into account that defendant was wanted in Pennsylvania *257 for armed robbery. What persuaded us to remand the matter for a full hearing was defendant's insistence that certain affidavits filed by Carlisi and Hartel established his innocence. Although we strongly suspected that his application for permission to withdraw his non vult pleas and to plead over was based on nothing more than fabrication, we did express the view that there was a "possibility" that a man with so lengthy a criminal record might plead non vult when confronted with the Carlisi and Hartel statements directly implicating him in the crimes with which he was charged, and if on full hearing he could prove the statements false, it would be a miscarriage of justice to refuse him a hearing.
Defendant's somewhat belated move to withdraw his non vult pleas is quite understandable. He will shortly have served his sentence on indictment No. 128  after receiving such time credits as he may be entitled to. His hope is to rid himself of the other three charges, either before a jury or otherwise. He undoubtedly counts upon time having blunted the edge of the prosecution's case, or that there are persons inside and outside the prison walls who could somehow convince a judge and jury that his partners in crime wrongly implicated him.
At the County Court hearing Bellino, who was involved with defendant in the Standard Brands (indictment No. 128) and Applegate (No. 129) crimes, was called as a witness by the court. He testified that defendant was not involved in the Applegate theft, but said nothing about the Standard Brands affair, in which he, defendant and Hartel were also involved. He said he had never given the State a statement implicating defendant. However, the court called to the witness stand the probation officer who had taken Bellino's statement in 1954 as part of the presentence investigation on Nos. 128 and 129. That statement implicated defendant and Hartel in the two crimes, Bellino serving as lookout man. Commenting upon this phase of the testimony, the county judge concluded that Bellino had been impeached.
*258 Defendant's first witness was Stephen Young, an uncle of Hartel, who testified about an affidavit Hartel had executed late in 1957 stating that the statements signed by him in 1954 implicating defendant had not been read by him, that he had signed them on the promise of receiving a suspended sentence, and that defendant was in no way involved in the Applegate crime. Contrast this testimony with Hartel's, mentioned hereafter.
Defendant then called Carlisi, who admitted giving statements to the police in 1954 (described above) involving defendant in the Cooper and Jones crimes, Nos. 127 and 130. Carlisi received an indeterminate sentence in the Bordentown Reformatory for his participation. He admitted signing the statements but said he had never read them; he did not remember giving the police "that type of answer"  and this in the face of the extraordinary detail of the statements adverted to above. He testified that he alone had broken into the two houses. He admitted that his uncle, a patrolman, was present when he signed the first of these statements dealing with the Cooper crime, and that he had participated in the questioning.
Asked on cross-examination about an affidavit he had executed while in State Prison in 1958 and which absolved defendant, Carlisi said it had been prepared in the cell of one Larry "Jacknick," whose last name he could not spell. (His reference was probably to Lawrence Janiec, who has repeatedly been before our courts. See State v. Janiec, 52 N.J. Super. 1 (App. Div. 1958)). The court then inquired why he had waited until 1958 to correct his error. Carlisi's answer was that he did not know how to correct it. He recalled writing to the assistant prosecutor and the detectives stating that defendant was innocent of the crimes charged. (The reference here is to the letters Carlisi wrote the judge, prosecutor and detectives before sentence.)
Having heard and seen Carlisi on the witness stand, and after considering his testimony, the court characterized him *259 as a "self-confessed liar * * * on the basis of these contradictions."
Defendant next called Hartel as a witness, after his attorney stated he was doing so although "I do not necessarily wish to be bound." The court properly observed that the decision to call Hartel was entirely defendant's. Testifying as to statements he had made in 1958 exonerating the defendant of the Applegate crime, Hartel flatly said the statements were inaccurate. He had made them only because he was in prison and thought they might help defendant get released. He said he had never read anything he signed in prison; "Every once in a while somebody came up and said, `here, sign this for Torzillo.'" He insisted that the statements he had given the police in 1954 at the time of his arrest were true; they were voluntary and no threats had been made or promises given. He affirmed from the stand that defendant was with him when the Applegate apartment was robbed, as was Bellino.
Although Hartel's testimony at the full hearing confirmed the statements given in 1954, the County Court judge concluded that the affidavit he had executed in prison, as well as the letter he had sent a certain attorney in 1957 absolving defendant of the Applegate crime, directly contradicted them, so that the witness had impeached himself.
Defendant took the stand in his own behalf. He said he had pleaded non vult to the four indictments in the middle of his trial on No. 128 only because the assistant prosecutor had shown him the Hartel and Carlisi statements implicating him, the letter absolving him which Carlisi had copied, as well as the handwriting expert's report that the letter was in his handwriting. He said the assistant prosecutor had told him that if found guilty on the charge for which he was being tried, he would be sentenced as a multiple offender. (Later, as noted, he conceded that he was not complaining of the assistant prosecutor's conduct.) The County Court was not impressed by this explanation, nor are we.
*260 Detective Kowal, who took the Carlisi statements, testified that Carlisi dictated them sentence by sentence, his uncle being present at the time he made the statement concerning the Cooper crime. He said there were no threats or promises made. A few months after Carlisi gave the police the statements concerning the Cooper and Jones thefts, he gave them another statement identifying a screwdriver used in the Jones theft and one of the pieces of jewelry taken. Again he implicated defendant. Kowal also testified as to the voluntary character of the Hartel statements. He said defendant had written him just before sentence asking that he see him. When Kowal visited defendant in jail shortly after, he wanted to make a deal and have him intercede with the judge.
One of the men present when Carlisi's last statement was taken testified that Carlisi had read it and voluntarily signed it. Finally, the assistant prosecutor took the stand and said that when he showed the Hartel and Carlisi statements to defendant there were no threats or promises made. He had spoken to defendant in the presence of his counsel.
We conclude that the County Court, in the sound exercise of judicial discretion, properly denied defendant's application to be permitted to withdraw his non vult pleas. They were deliberately and understandably made, with the advice of counsel and with full knowledge of the nature and consequences of his act.
R.R. 3:7-10(a) provides that:
"A motion to withdraw a plea of guilty or of nolo contendere or of non vult, may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice, the court, after sentence, may set aside the judgment of conviction and permit the defendant to withdraw his plea." (Italics ours.)
There was a complete lack of judicial unfairness in the acceptance of the non vult pleas, or in the hearing accorded defendant on the remand. We find no "manifest injustice" which required correction.
*261 A motion to withdraw a plea of non vult should be denied where the plea was entered by defendant or by his counsel in his presence, if defendant knew and understood what was being done and there was absent any circumstance of force, mistake, misapprehension, fear, inadvertence or ignorance of his rights and of the consequences of his plea. United States v. Colonna, 142 F.2d 210, 211 (3 Cir. 1944).
The contention that defendant was coerced by the assistant prosecutor into changing his plea is completely baseless. Not only do we have the testimony of the assistant prosecutor to the contrary, but defendant himself admitted that the assistant prosecutor's conduct was entirely proper.
Finally, defendant claims there was interference in the relationship between himself and his lawyer because two detectives spoke to Hartel during the court recess and, upon being admonished by defense counsel not to speak to him, allegedly told the attorney, "You better watch yourself. We are going to pinch you and throw you in jail next." We do not know just how this could have affected the lawyer-client relationship. The attorney certainly made no such claim, and we discern no effect whatsoever that the incident may have had on his continuing, able representation of his client. Nor is there any showing that Hartel's testimony was influenced by any conversation he may have had with the detectives  if, indeed, that conversation concerned the trial at all.
Since the institution of our new judicial system in 1948 and under the rules governing criminal practice and procedure defendants are given a most liberal opportunity to bring their just grievances before our courts for review and correction. This is as it should be. However, recent years have seen a growing tendency on the part of some prisoners to play fast and loose with the truth. During the last court year this court considered more than 100 prisoner applications for leave to proceed as an indigent, most of them accompanied by a request for court-assigned counsel and a free transcript. In a number of cases where such *262 application was granted, our review of the record showed that the representations on which the application was based were completely unfounded in fact. Among them were claims that defendant had been "overborne" by the police authorities, prosecutor or even by his own attorney; that counsel (sometimes of his own choosing but more often assigned) had not competently represented him; that the prosecutor or the judge "inflamed" the jury, and the like. Such claims, conjured up in prison leisure, projected from a springboard of untruth, and shaped into motion papers and briefs by prison "lawyers," set in full motion procedures which have the worthier purpose of correcting inequity where it exists and insuring justice. They constitute a completely unjustified drain upon the county treasury, which pays for the free transcript; the time and energies of the bar, whose members (assigned by the court) generously and ably give of their services without compensation; the time and effort of the prosecutor's office and, finally, the time of the court.
We have until now been loath to suggest that those who subscribe to false affidavits or lie without qualm at hearings be proceeded against under our criminal statutes. The time has come to put a halt to a worsening situation.
What we have here is a bold attempt by defendant to fight clear of sentences yet to be served, rid himself of pleas voluntarily and understandingly made, and gamble on the outcome of a jury trial. That it involves false swearing or perjury, or both, is shockingly evident. Carlisi lied, either in his statements or on the stand. So did Hartel. Bellino is also under the shadow. Defendant, the apparent mastermind, stands at dead-center of the entire scheme. Prompt and positive action by the county prosecutor is clearly called for so that those who sought to pervert our court processes to their own purpose will be made to pay the penalty justly due them.
The County Court's denial of defendant's application is affirmed.