104 N.J. Super. 67 (1968)
248 A.2d 559
THE STATE OF NEW JERSEY, PLAINTIFF,
v.
NORMAN CLARK, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided December 4, 1968.
*68 Mr. V. Michael Rossi for defendant.
Mr. Harold Springstead, Assistant Prosecutor for the State (Mr. Guy Calissi, Bergen County Prosecutor, attorney).
GALANTI, B.P., J.C.C. (temporarily assigned).
Defendant pleaded non vult on December 2, 1963 to indictment No. S-94-63 on the charge of homicide. He was sentenced to the New Jersey State Prison for not less than 15 nor more than 25 years. Defendant has filed an application for post-conviction relief on the following grounds:
1. There is newly discovered medical evidence which indicates that his acts were not the natural and probable cause of the death of the victim.
2. His plea of non-vult was not voluntarily made.
3. Court-appointed counsel was ineffective, insufficient and not of defendant's own choosing.

*69 4. The reason upon which the trial court based the imposition of sentence was erroneous, and further, failed to take into consideration the probation report.
The first contention presents a question of novel impression in the State of New Jersey, but first the court will deal with defendant's claim that his plea of non vult to the indictment was not voluntarily made. An examination of the transcript discloses that the questions propounded and the answers given thereto by defendant reveal that the judge made an exhaustive inquiry on the day the defendant pleaded, to determine whether or not his plea was voluntary and to insure that it was in fact voluntary. The argument that the plea was involuntary is without merit.
As to the contention that court-appointed counsel was ineffective, insufficient and not of his own choosing, defendant was asked whether he was satisfied with the services of the assigned counsel and he answered in the affirmative. The trial judge exhaustively questioned the accused at the time and made sure he was satisfied with his assigned counsel. The court finds that this claim is completely without merit.
Defendant alleges that he was under tranquilizing medication for "shock and depression upon learning of his wife's demise" and, as a result of his condition and the effects of the medication, was lacking the requisite mental capacity to enter a plea of non vult to the indictment voluntarily and understandingly. The court rejects this contention. Tranquilizing drugs are also known as ataractic drugs since they are intended to induce ataraxy. The term "ataraxy" means absence of anxiety, or untroubled calmness. American Psychiatric Assn. Committee on Public Information (A Psychiatric Glossary, 1957).
Tranquilizing drugs are drugs used to reduce anxiety and tension without reducing mental alertness. Webster's New Collegiate Dictionary, (1967). The record shows the plea was entered after defendant had consulted with his counsel, and was not accepted until the trial judge had conducted an *70 exhaustive inquiry into defendant's comprehension of the nature and consequence of his pleading non vult. After such inquiry the judge determined the plea to be voluntary and that defendant understood exactly what was happening. The proceeding was conducted in open court, under the fairest of conditions and with the assistance of counsel. In State v. Torzillo, 61 N.J. Super. 253 (App. Div. 1960), the court stated:
"A motion to withdraw a plea of non vult should be denied where the plea was entered by defendant or by his counsel in his presence, if defendant knew and understood what was being done and there was absent any circumstance of force, mistake, misapprehension, fear, inadvertence or ignorance of his rights and of the consequences of his plea." (at p. 261)
In further dealing with defendant's contention that his plea was not voluntary because he was under the influence of tranquilizers, this court cites United States v. Tom, 340 F.2d 127 (2 Cir. 1965), where the court held:
The fact that the petitioner was an addict who had been deprived of drugs except tranquilizers for four days prior to the entry of his plea of guilty does not render him per se incompetent to plead to the charges against him.
See also Roddy v. United States, 296 F.2d 9 (10 Cir.).
Consequently this court finds no basis for concluding that defendant lacked the requisite mental capacity to enter a plea of non vult.
Finally, defendant contends there is newly discovered medical evidence as to the cause of death of the victim.
Dr. Robert M. Livingston testified that he examined the records concerning the victim's hospital stay and also examined the autopsy reports; that she died as a result of the lack of blood before the operation and insufficient blood transfusions during her stay in the recovery room; that she was not a prime risk for surgery; that had he been the operating surgeon he would have operated a second time (he further *71 criticized the hysterectomy and removal of the cervix), and, that if more blood had been transfused into her after the operation she would have lived.
Dr. Frank Drews, Jr. testified that he examined and operated on the deceased and saw her in the emergency room; he described the course of the projectile; he testified that there were eight perforations in the small bowel; he described the operation and that the deceased never responded thereto and that she was never without blood from the moment she entered surgery until her expiration. He described the county physician's autopsy report. He also described the course of the bullet, the amount of blood and time of the transfusions, and that she died from shock and damage caused by the gunshot wound.
The question of responsibility for homicide where the victim's death resulted from the intervening treatment or mistreatment of the wound or injury inflicted by the accused, not from the wound or injury itself, is a novel question before a New Jersey court. Consequently an exhaustive search of the authorities in other jurisdictions for guidance in dealing with this novel problem has been made.
"The question is whether, where the alleged victim's death immediately results from medical treatment or mistreatment of a wound or injury inflicted by the accused, there is the necessary legal connection between the accused's wrongful act and the result, or whether the medical treatment or mistreatment of the wound or injury is an intervening cause which breaks the chain of causation leading from the accused's wrongful act to the victim's death. Most of the cases presenting the question have arisen in jurisdictions having no statute expressly dealing with the effect of medical treatment of an alleged homicide victim's wound or injury. * * * In those jurisdictions wherein there is no statute expressly dealing with the effect of medical treatment of an alleged homicide victim's wound or injury, it has generally been held or expressly recognized that one who has inflicted a wound or injury upon another is criminally responsible for his death, notwithstanding that different or more skillful medical treatment might have saved his life, or that death was immediately caused by a surgical operation rendered necessary by the existence or condition of the wound or injury. In such cases the accused's initial wrongful act is deemed to retain its causal character, on the ground that the intervening act of *72 administering medical or surgical treatment was a foreseeable consequence of the accused's initial act and was dependent upon and arose out of the original cause of death. * * * In these jurisdictions the basic rule is that where a person inflicts upon another a dangerous wound, that is, one calculated to endanger or destroy life, it is no defense to a charge of homicide that death was contributed to by or immediately resulted from unskillful or improper treatment of the wound by attending physicians or surgeons. * * * There are several strong intimations that the basic rule is limited to mere negligent treatment and is not applicable to willful mistreatment. Furthermore, it is generally recognized that gross maltreatment of the wound, which was the sole cause of death, is available as a defense to a charge of homicide, because the wound was not the proximate cause of death. * * *
In the absence of a statute expressly dealing with the effect of medical treatment of an alleged homicide victim's wound or injury, it has generally been held or expressly recognized that an accused who inflicted upon the alleged victim an injury which is calculated to destroy or endanger life cannot exonerate himself by showing, that different or more skillful medical treatment might have saved the victim's life, * * * or that death was immediately caused by a surgical operation rendered necessary by the existence or condition of the wound."
See 100 A.L.R.2d pp. 772-777; Quillen v. State, 49 Del. 163, 110 A.2d 445 (Sup. Ct. 1955); State v. Cox, 82 Idaho, 150, 351 P.2d 472 (Sup. Ct. 1960); Hall v. State, 199 Ind. 592, 159 N.E. 420 (Sup. Ct. 1928); People v. Nerida, 29 Cal. App.2d 11, 83 P.2d 964 (Ct. App. 1938); Osborn v. Commonwealth, 6 Ky. Law Rep. 47, 12 Ky. Ops. 649 (Ct. App. 1884), holding that where a wound is calculated to produce death and a surgical operation is performed at the instance of competent physicians, when in their opinion it becomes necessary, and the patient dies, the party inflicting the wound is responsible criminally for the act, although the operation may have been the immediate cause of death.
In Odenal v. State, 128 Tenn. 60, 157 S.W. 419 (Sup. Ct. 1913), the court dealt with this problem in the following manner:
"The rule on this subject, supported by the weight of authority, is that to exonerate the accused from the charge of causing death by a dangerous wound unlawfully inflicted, it must appear, not only *73 that the operation was performed in a grossly negligent and unskillful manner, but also that it was the sole cause of the death, and not one of a series of intermediate causes, following in the train of injury, the original cause. One who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause. One of these dependent occurrences is the necessity of surgical aid, which may eventuate as the immediate cause of death. Surgical aid must be employed, with the attendant risks. Surgeons are not infallible. They are required to have and exercise only reasonable skill, measured by the rule of their art or profession. When the accused inflicts the injury that necessitates the operation, he is held to assume the risk attendant on it. Much is required before the surgeon can be substituted for the defendant."
In People v. Paulson, 80 Ill. App.2d 44, 225 N.E.2d 424 (App. Ct. 1967), where the deceased died from meningitis caused by infection which entered the surgical incision during an operation for a subdural hematoma due to a blow on the head from the defendant, the court held as a matter of law that
"A supervening act will not relieve an accused from responsibility for the death of another unless that act was disconnected from the act of the accused. * * * In the instant case, according to the uncontroverted testimony, death was caused by an infection which developed during an operation to relieve a hematoma, the hematoma having been caused by a blow to the head allegedly inflicted by the defendant. The chain of events ultimately causing the death of Lee James was set in motion by the act of the defendant, and therefore the resulting infection was not disconnected from the defendant's act."
Finally, in People v. Meyers, 392 Ill. 355, 64 N.E.2d 531 (Sup. Ct. 1946), the court stated:
"The law is that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant. * * *"
*74 In 1 Hale's Pleas of the Crown, p. 428, it is said:
"But if a man receives a wound, which is not in itself mortal, but either from want of helpful applications or neglect thereof, it turns to a gangrene, or a fever, and that gangrene or fever be the immediate cause of his death, yet, this is murder or manslaughter in him that gave the stroke or wound, for that wound, though it were not the immediate cause of his death, yet, if it were the mediate cause thereof, and the fever or gangrene was the immediate cause of his death, yet the wound was the cause of the gangrene or fever, and so consequently is causa causatic."
New Jersey has no case law on this particular point; the closest it seems New Jersey comes to dealing with this general type of a problem is in State v. Loray, 41 N.J. 131 (1963), where, in dealing with a blow to a person with a preexisting heart condition, we find the Supreme Court looking to the Iowa court and other authorities for guidance and deciding the fact that a victim of an assault is in a weakened condition or suffers from disease and as a result succumbs to a blow which might not be fatal to a person in perfect health does not lessen the criminal responsibility for causing death. We know of no duty imposed upon a victim to supply a guarantee of good health to a robber.
Defendant cites the case of State v. Johnson, 6 W.W. Harr. 341, 175 A. 669 (Del. Sup. Ct. 1934), as the controlling law in this case. The court there said:
"If you [jury] shall be satisfied that the accused unlawfully did inflict upon the deceased the wound, but shall entertain a reasonable doubt whether the wound was one calculated to endanger life and whether the death of the deceased resulted therefrom, or from misconduct of the deceased, or maltreatment of the wound, your verdict should be not guilty of manslaughter, but guilty only if the evidence shall so warrant."
In the present case, we are dealing with a gunshot wound  certainly a wound that is calculated to endanger human life. The Delaware law on this point can be found in Quillen v. State, 110 A.2d 445, at p. 454 (Sup. Ct. 1955), which held that:
*75 "If the death of the wounded person resulted from or in the course of treatment by medical men who follow the usual course of practice that good physicians adopt, in an endeavor to heal the patient, the person who has inflicted the wound is chargeable with the death. * * * Now it is one of the ordinary consequences of a wound that a medical man should be called in to treat it; and is one of the probable incidents of medical practice that the patient should die under treatment. And the person inflicting the wound is responsible for this, as one of the consequences which in the natural course of events, results from his unlawful act."
In the present case defendant Clark shot his wife; she received medical treatment which this court finds was in the usual course of practice that good practitioners adopt and, consequently, defendant is chargeable with her death.
Defendant also cites State v. Zelichowski, 52 N.J. 377, (1968), which holds that a homicide conviction could not be sustained without proof beyond a reasonable doubt of a proximate relationship between defendant's attack on the victim. That case does not apply here. This court finds no reasonable doubt as to defendant's act and the resulting death of his wife. That act was the sole proximate cause of her death, and the evidence he has produced has not cast the slightest shadow of doubt upon that conclusion.
As a trier of the facts I give to the testimony of the two doctors the weight to which I deem it is entitled, and I may reject their opinion. I find as a fact that the wife's death was not caused by a supervening act disconnected with any act of defendant.
Finally, as to the contention that the trial judge failed to take into consideration the probation report, the record is clear that defendant was consulted and a proper sentence was imposed.
For all of these reasons the application for post-conviction relief is denied.